Argued and submitted November 16, 2004, termination of mother's parental rights
reversed and remanded; otherwise affirmed January 18, 2006

In the Matter of
Kaley Fawn Engel, a Minor Child.

STATE ex rel DEPARTMENT
OF HUMAN SERVICES,
*Respondent,*

*v.*

Leanne HUSTON,
*Appellant.*

022628J2; A124733

126 P3d 710

James A. Palmer argued the cause and filed the brief for appellant.

Rolf C. Moan, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Edmonds, Presiding Judge, and Brewer, Chief Judge, and Deits, Judge pro tempore.

EDMONDS, P. J.

Brewer, C. J., concurring.

Deits, J. pro tempore, dissenting.

## EDMONDS, P. J.

Mother appeals a judgment terminating her parental rights to her daughter, K, on the ground that mother is an unfit parent under ORS 419B.504 by reason of emotional illness, mental illness, and mental deficiency.[1] On *de novo* review, ORS 419A.200(6)(b), we conclude that the state failed to prove by clear and convincing evidence that mother's conditions rendered her unfit as of the time of the termination hearing. We therefore conclude that mother should have the opportunity to demonstrate her post-treatment parenting skills, particularly in light of the fact that mother's most recent treatment providers uniformly agree that she possesses adequate parenting skills. Accordingly, we reverse the trial court's termination of mother's parental rights.

K, who was born in 1996, was removed from mother's home, along with D, mother's teenage son, and J, her infant son, by the Department of Human Services (DHS) following a police raid in June 2002. At the time of the raid, which was based on probable cause that drug activities were occurring on the property, there were a number of conditions in mother's home that made it unsuitable for children. Police found drugs and drug paraphernalia, including needles; the house was filthy and cluttered; and "transients" who were known drug users were in the home and an attached dwelling.

Following the removal of the children from mother's home, mother and DHS agreed to a plan to protect her children from the hazards posed by her lifestyle and to allow for a return of the children to her home. Under the terms of the plan, mother was to become drug and alcohol free and to develop assertiveness in order to impose healthy boundaries that would protect her children from dangerous people and environments. The agreement provided that, if mother complied with the plan, her children would be returned to her custody.

---

[1] The Department of Human Services also sought termination of father's parental rights. He did not appear at trial or on appeal, and the judgment as to his parental rights is not at issue on appeal.

In August 2002, mother underwent an assessment by the Lincoln County Health and Human Services Department. During the assessment, she admitted to using methamphetamine in July, but denied that she had a substance abuse problem. The assessment included random urinalyses for drug use. As a result of the assessment, mother was referred for drug and alcohol counseling. In September 2002, mother was diagnosed by psychologist James Ewell with methamphetamine dependence, polysubstance dependence, generalized anxiety disorder, post-traumatic stress disorder, and a personality disorder with borderline and antisocial features. Mother tested positive for methamphetamine use on September 30 and October 4. On October 21, Lincoln County terminated services to mother after she failed to contact its addiction/drug counselor. On December 5, 2002, mother again tested positive for methamphetamine use.

In January 2003, approximately six months after K was removed from mother's custody, the state filed the petition in this case to terminate mother's parental rights to K. By that time, mother had embarked on a treatment program with psychologist Katherine Andrews. In February 2003, psychologist Rory Richardson conducted another psychological evaluation of mother. He diagnosed her as having a polysubstance dependency in remission, an adjustment disorder with elements of paranoia and depression, and an obsessive-compulsive personality disorder with narcissistic and histrionic elements.

The termination hearing in this matter began in October 2003 and continued for three days before it was postponed. The hearing was then completed on March 3, 2004. After the hearing, the trial court made the following findings of fact and conclusions in April 2004:

> "Mother has demonstrated a long history of substance abuse in which she has experimented with a wide range of substances since the age of 14. Criminal probation and loss of her children have provided her with the impetus to achieve sobriety. Mother's sobriety is externally confirmed and is largely consistent. The evidence supports mother has a sincere interest in effecting a change regarding her drug use.

"Sobriety, in turn, has given her the clarity of thinking required to obtain employment. She is now able to maintain her household. These changes are certainly supportive of the return home of [K] who appears normal and has no special needs per Dr. Ewell.

"Mother has been less successful in addressing her propensity to allow others access to her household. Her present boyfriend came into her home after the initiation of dependency proceedings. He has a felony conviction for drug possession (methamphetamine) and a misdemeanor conviction for carrying a concealed weapon. He was on probation at the time of the termination trial. * * * He is currently coping with his own recovery. He has a number of children and does not appear to be intimately involved in their lives.

"During the course of her use, Mother allowed an unfiltered array of dangerous individuals to enter her home. Ideally, this deficiency of judgment would disappear when sobriety had been achieved. But the facts are not entirely supportive of that ideal. The injection of [mother's present boyfriend] into the equation needlessly creates another set of variables pertaining to his sobriety, his behavior, his associations and his ability to parent. While the number of individuals ha[s] been reduced, mother has demonstrated an inability or unwillingness to prudently screen her acquaintances.

"* * * * *

"The evidence has also demonstrated a tendency of Mother to minimize or rationalize even after effecting sobriety. * * *

"Coupled with this are the odd circumstances surrounding the hair plucking. Mother first sought medical treatment suggesting to her physician a fungal or parasitic cause for the hair loss, even though the cause of the loss should have been clearly known to [m]other. * * *

"On the second examination by Dr. Richardson, Mother stated that she was intermittently using large amounts of very strong crystal methamphetamine. * * * The problems [with the hair] were worse during sex and methamphetamine use. * * * The symptom descriptions [by Mother] have a delusional quality.

"Dr. Ewell and Dr. Richardson diagnosed psychological problems. Both opined that mother was a dual diagnosis

patient. It is evident that sobriety, while a truly commendable first step, is not the cure-all. Presently, Mother demonstrates a significant tendency towards minimization and lack of responsibility. She has significant durable psychological problems which will require extended treatment. This treatment has not been successfully effected. Mother continues to make inappropriate relationship choices. *Mother is not presently a viable safe parenting choice.* Father has abandoned the child. His parental rights should be terminated.

"*The parental rights of mother should be terminated based upon the following aspects of unfitness; emotional illness, mental illness and mental deficiency have been demonstrated.*"

(Emphasis added.)

■    Before engaging in a more thorough review of the record, we pause to identify the legal framework in which the evidence in this case must be viewed. The governing statute is ORS 419B.504, which provides, in part:

"The rights of the parent or parents may be terminated as provided in ORS 419B.500 if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child or ward and integration of the child or ward into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:

"(1)    Emotional illness, mental illness or mental deficiency of the parent of such nature and duration as to render the parent incapable of providing proper care for the child or ward for extended periods of time."

ORS 419B.521(1) defines the state's burden of proof regarding its allegations under ORS 419B.504. It states, in part, "The facts on the basis of which the rights of the parents are terminated, unless admitted, must be established by clear and convincing evidence * * *." The "clear and convincing" standard of proof imposed by ORS 419B.521(1) is required by the due process clause of the Fourteenth Amendment, *State ex rel Juv. Dept. v. Habas*, 299 Or 177, 180 n 1, 700 P2d 225 (1985), and is generally understood to refer to evidence that

makes an asserted fact highly probable, *see, e.g.*, *State ex rel Juv. Dept. v. Johnson*, 165 Or App 147, 156, 997 P2d 231 (2000).

■ When applying the standard of clear and convincing evidence to the facts of this case, it is important to identify what is at issue, *i.e.*, what the state must prove by clear and convincing evidence. The trial court terminated mother's parental rights *solely* on the ground that mother was unfit by reason of emotional illness, mental illness, and mental deficiency.[2] Accordingly, we must determine whether the state proved that, at the time of the completion of the termination hearing in March 2004, it was *highly probable* that mother's mental and emotional disorders rendered her incapable of providing care for K for extended periods of time and that mother's condition was unlikely to change within a reasonable time. The state does not carry this burden simply by demonstrating that mother suffers from mental or emotional disorders. Rather, the overriding issue is whether, at the time of the completion of the termination hearing, there was clear and convincing evidence that mother's disorders, to the extent that they existed, caused her condition to be so seriously detrimental to K's welfare so as to warrant a finding of unfitness.

With those standards in mind, we return to the evidence in the record. Because the trial court's decision to terminate and the state's argument on appeal rely heavily on the diagnoses by Ewell and Richardson, we begin by focusing on their diagnoses and testimony. Ewell and Richardson were the only expert witnesses at the hearing who supported termination. Significantly, neither Ewell nor Richardson ever evaluated mother *after* she successfully completed her drug treatment program. Stripped of its drug-related diagnoses, Ewell's diagnosis essentially involved the following three components: (1) a "Generalized Anxiety Disorder"; (2) "Post-Traumatic Stress Disorder" (PTSD); and (3) "Personality Disorder, with Borderline and Anti-Social Features."[3] According to Ewell, a generalized anxiety disorder is

---

[2] As will be discussed in more detail below, mother's emotional illness consists of personality disorders, as contrasted to illnesses like psychosis, schizophrenia, or bipolar disorders.

[3] Although the dissent emphasizes that mother's report of pulling out her hair could be indicative of a condition called "trichotillomania," neither Ewell

"a condition wherein an individual reports * * * that most days they experience a level of stress that is upsetting to them, if not overwhelming, and they have a great deal of difficulty overcoming this * * * level of anxiety." A diagnosis of PTSD, Ewell reported, was appropriate because mother had "some flashbacks of her oldest child's father beating her. If she encounters similar situations, or is reminded of this relationship, she also 'over-reacts.'" Ewell's diagnosis of a personality disorder was offered, according to his report, because mother's psychological test results suggested "moodiness and difficulty controlling frustration." Ewell was asked, "What determines that someone has a personality disorder that's untreatable?" Ewell answered, "[I]n most cases, treatment is tried and despite that attempt, it's clear that a person is not making any progress. I don't know of any ways to determine ahead of time that it's going to be possible * * *." When Ewell was asked whether people with mother's diagnoses (anxiety disorder, PTSD, and personality disorder) are able to parent adequately, he answered, "Some of them can. Some—of them cannot." Also, counsel asked Ewell at the termination hearing, "So you had no opinion as to her mental status as of today. Correct?" Ewell answered, "Yeah, I could not say as of today, no." He conceded, however, that abstinence from the use of drugs and evidence that a person was in a "positive, supportive, functional relationship for a year * * * would be seen as a good sign" that the person's disorder had been treated or was now in remission.

Dr. Richardson's examination, conducted five months after Ewell's evaluation, yielded results that were somewhat different from Ewell's diagnoses. Richardson's report indicated that "[t]here does not appear to be any indicators suggestive of post-traumatic stress." He did, however, find that mother suffered from an obsessive-compulsive personality disorder with narcissistic and histrionic elements. At the termination hearing, he explained,

---

nor Richardson conclusively diagnosed mother with that condition. Rather, Richardson made a "provisional diagnosis" in 1999 when he first saw her that "other factors needed to be eliminated first." Ewell thought that there was an "issue involving this sort of behavior with—with her hair." In any event, there is no evidence in the record that mother's condition relating to her hair had any impact on her ability to parent K.

"Obsessive-compulsive personality disorder is a personality pattern that is developed over a long period of time. Personality patterns are ones that tend to be more entrenched. Low resistance to change, tend to be linked in with the person's survival system, maintain their ego strength, et cetera. And ties into psycho dynamic elements throughout the childhood, adulthood, and things like that. The narcissistic elements—a person thinks that they are too good for certain things or, you know, has an elevated perception. The narcissistic trait is not necessarily a pathology per se. It is a—it is common in individuals that have specific types of high ranking positions and professions. And individuals that have a—maybe have underlying low self-esteem. * * * The histrionic [element] is a reactive element. It's kind of like a person tends to panic in certain situations."

Richardson also wrote in his February 2003 report:

"Based on this evaluation, it does not appear that there [are] any specific indicators supporting neurological impairment. There [do] appear to be indications suggesting that she is in the early phase of recovery and that she is gaining from recovery at this time. Continuing treatment and complying with treatment goals is suggested; there [are] some issues relating to issues of control within chemical dependency which are slowly being addressed based on the evaluation and certain values of that testing. The report of exposure to toxins specifically associated with her scalp and with what appears to be relatively compulsive patterns suggest[s] that there would be value in addressing obsessive-compulsive personality patterns, as well [as] gaining a referral to and consultation from an endocrinologist expert in toxic response. There is also indication that she is utilizing the 12-step program in addressing some of the emotional issues that she has concerning her situation with [DHS] and involvement of them in her life, noting that documentation from [DHS was] available for review and this evaluation is not intended to be used to determine fitness for parenting. Additional assessment would be necessary to determine if this were appropriate. * * * The one issue that does appear to be pertinent, is that she does appear to be making specific changes and gains in her recovery. It is this writer's feelings that it is important that [mother] address issues of compulsivity and that she make attempts to change some of the reactive patterns. * * * [I]t would appear in the material presented and the testing completed

would support that she remains relatively intact with relatively average cognition and processing. Addressing some of the issues of hypervigilance and paranoia in the course of her alcohol and drug treatment is recommended."

In addition, Richardson recommended that mother "obtain and maintain some form of gainful employment at the earliest opportunity so that issues of self-esteem and emotional stability can be linked to productive functioning."[4] At the termination hearing, Richardson also testified that personality disorders like mother's could make her more rigid and reactive than would be healthy and that anxiety would become part of a family lifestyle.[5] But Richardson also was asked how mother's personality disorders could affect her parenting of the children living with her and her level of functioning. He opined, "[B]ased on what she was reporting, she was doing quite well."

The record also contains the testimony of two treatment providers who provided therapy to mother *after* Ewell's and Richardson's evaluations, and the testimony of a third person, a DHS employee who supervised mother's visitation with K over a period of months. Mother's treatment providers were Katherine Andrews and Rebecca Carroll. Andrews, who holds a Ph.D. in clinical psychology, began treating mother in November 2002, and her course of treatment for mother included more than 200 hours of therapy. Andrews testified that, although Discovery Counseling does not provide mental health counseling, "because of my background and training, I was monitoring the mental health side of things." Andrews explained that she is "trained as a psychologist first and foremost," but that Discovery Counseling was not licensed for mental health services at the time. In fact, Andrews had spent most of eight years working in the field of child psychology, doing parent training, and treating families with chronic mental illnesses. Also, her research and dissertation

---

[4] As discussed below, that is exactly what mother did thereafter.

[5] There is no evidence that mother's intellectual ability had any impact on mother's ability to parent K. In fact, Ewell found that mother "presented as an individual of low average intellectual ability. * * * She should be capable of meeting the basic cognitive demands associated with parenting." As described above, Richardson also found mother to be "relatively intact with relatively average cognition and processing."

work involved behavioral observations of "severely disordered children and families."[6]

Mother initially had contact with Andrews three times a week, contact that eventually changed to once a week. As indicated above, mother's entire course of treatment with Andrews consisted of more than 200 hours of therapy. At trial, Andrews was unwavering in her positive descriptions of mother's progress in therapy. She described mother as "one of those people that was ready to make significant [and] sincere change," "very committed," achieving remarkable growth, and experiencing a "real profound kind of change." Andrews also had an opportunity to work with mother's boyfriend, Daniel Walsh. Both mother and Walsh participated in Andrews's recovery groups. Andrews testified that she had no concern about either mother's or Walsh's abilities to remain clean and sober. She explained that, because both had the same level of commitment to sobriety and drug abstinence, there was a "synergistic effect in each of their treatments because they were committed to recovery first, and then to their relationship as recovering people. * * * That's good insurance for a relationship." Based on her observations and work with mother, Andrews testified that there was nothing that concerned her as far as mother's ability to parent.[7] At the conclusion of her testimony, Andrews was asked:

"Q. Dr. Andrews, a lot has been bandied around about advocating. If you felt that [mother] was not truly addressing recovery and treatment issues, was lying about any aspect of her recovery, would you continue to advocate [for the return of K to mother]?

"A. No, I wouldn't."

In February 2003, mother began individual mental health sessions with Carroll. Carroll is a clinical counselor

---

[6] A letter from mother's caseworker in March 2003 indicates that, "[b]ecause of [Andrews'] mental health background, she was asked to see [mother] to help her stabilize as she is considered a dual-diagnosis counselor, and [mother] was having a lot of anxiety and difficulty stabilizing." The letter further states that Andrews was working with mother "in what [Andrews] describes as an In House Mental Health Capacity * * *."

[7] Further, while Andrews never saw mother interact with K, she did observe mother interact with other children.

with Lincoln County Health and Human Services and contracts with DHS to provide services for that agency. Mother participated in 24 mental health sessions with Carroll, working on the issues identified in her mental health evaluations. Carroll also visited mother's home on three or four occasions and found the conditions of her home "adequate." Mother finished her therapy with Carroll in August 2003, approximately two months before the termination hearing commenced. During the time of her treatment with Carroll, mother obtained a sponsor in her 12-step program and attended a Narcotics Anonymous retreat. By April 2003, mother had graduated from her alcohol and drug treatment program and had obtained part-time employment. By August 2003, mother had obtained full-time employment, which she held at the time of the hearing.

Carroll was also asked about what were characterized as mother's "thinking errors." According to the testimony, "thinking errors are things that people do that basically are not in one's best interest." Carroll observed that "all people have some thinking errors." According to Carroll, one of mother's problems was not establishing boundaries when people wanted something from her. Carroll observed that mother was prone to resolve those kinds of circumstances by saying, " 'Yes, I'll take you here in my car,' * * * 'Yes, I'll let you spend the night here.' " Carroll helped mother devise a system "for managing when people came towards her and asked for things * * *." Carroll acknowledged that "codependency" was a "piece" of mother's anxiety disorder behavior pattern and that mother told her "that she felt better about herself when she was * * * able to help people * * * who had less than she did." Carroll testified that mother was receptive to techniques for dealing with her response tendencies, including a way by which she could "buy more time" to think about requests from others and a "breathing technique" for "symptoms of anxiety." On redirect examination, the state's attorney asked, "You talked about [mother] making progress. My question is, did she get there?" Carroll answered, "I say she got three-quarters of the way there."[8]

---

[8] Mother's "thinking errors," as expressed in some of her trial testimony, appear to drive the dissent's conclusion that she is an unfit parent. 203 Or App at 671-73 (Deits, J. pro tempore, dissenting). The dissent is correct that portions of

Part of mother's treatment with Carroll also involved parental coaching. In those treatments sessions, Carroll observed mother interacting with K and with J, her younger son. Carroll described mother's parenting abilities during those observations:

"During the visits that I observed with [mother] and her children, [mother] was surprisingly aware of their psychological needs and able to shift back and forth between one child and the other, and meet with them at their developmental level in an activity or issue that came forth, like say, [K] having tearfulness about something in a—during a visit."

Carroll was asked whether she found mother "supportive and interactive" during those visits and testified that there was never anything in the visits that gave her any concern about mother's fitness to parent.

In addition to the evidence from Andrews and Carroll about mother's mental health status at the time of the termination hearing, mother participated in parenting classes and weekly visits with K and J. Tamera Kniskern, a DHS-trained employee with four years' experience, supervised mother's visits with her children after their removal from mother's custody until March 2004. Kniskern's initial contact with mother was in July 2002, and her last contact with mother and her children occurred on March 1, 2004.

her trial testimony, when referring mostly to past events, tended to minimize the risk that those past events created for K. The dissent infers from mother's defensiveness at trial that mother is unable to understand the risks to which her behavior exposed her children. 203 Or App at 671-72 (Deits, J. pro tempore, dissenting). As discussed below, mother does acknowledge that she put K at risk. Moreover, Carroll was questioned extensively by the state's attorney regarding mother's thinking errors. Carroll never claimed that mother's thinking errors had ended. But in the process of working with mother, Carroll said that mother came to the point of taking responsibility for the conditions that led to removal of K. Carroll opined, "I think that thinking errors are something that are challenged slowly, and I think [mother] made—began a process of changing her thinking." According to the available diagnoses, mother suffers from a personality behavior pattern that is stress induced, causing her to panic and become defensive. It is equally inferrable that the examination of mother on the witness stand induced the defensiveness and minimization relied on by the dissent. Regardless, it simply does not reasonably follow from Carroll's testimony that it is highly probable that mother will resume her prior behavior when mother has made significant progress in understanding her responsibility for her past actions.

Beginning in January 2003, mother's visitations became consistent and continued throughout the dates of the hearing. Kniskern testified that mother and K are bonded, that mother did "really well" with her children, and that the children were eager to see their mother. In response to the question whether she had observed anything in those visits that gave her concern about mother's parenting abilities, Kniskern replied, "I'd say no. She handles her children very well during visits." In fact, Kniskern testified that she was "impressed with that—what I see during the visits."

The dissent minimizes the success of mother's treatment with Carroll and Andrews, reasoning that, before February 2003, mother had rejected or not followed through with county mental health services. 203 Or App at 671 (Deits, J. pro tempore, dissenting). However, mother's refusal to embrace those earlier offers came at times in which she had denied that she even had a *drug* problem. By February 2003, mother was receiving drug and alcohol counseling with Andrews, mental health counseling with Carroll, and parenting training with Kniskern, and she reported her compliance with the mental health requirements of the plan for her reunification with K to Janine Buel, the person in charge of her plan. Moreover, Sven Johnson, the Lincoln County caseworker assigned to mother's case between October 2002 and June 2003, was well aware of the mental health treatment that mother was receiving from Carroll and Andrews. In March 2003, Johnson sent a letter to Carroll describing Andrews's work with mother over the previous four to five months in an "In House Mental Health Capacity." Then, in May 2003, Johnson sent an e-mail indicating that "temporary placement was the plan with a possible return home" if mother was "fully engaged [in services] over the next five to six months."

Johnson testified that, at that time, DHS was evaluating and reevaluating the appropriateness of the plan to return K to mother, but that it made sense to proceed with termination. Significantly, there is no evidence that, between February 2003 and the commencement of the termination hearing, mother was ever informed by anyone that the mental health counseling she was receiving through county health services was inadequate, or that she was told that she

needed *additional* services if she were to be reunited with K. Finally, there is no evidence that she was offered and refused any additional mental health services during that time period. In sum, although mother initially rejected mental health services *before* February 2003, she subsequently obtained the county's services and fully complied with the requirements for those services with the understanding that she could be reunited with K in the future. In our view, the above course of conduct substantially undercuts the dissent's assertion that mother never sought or obtained the mental health therapy that Ewell and Richardson recommended.

Indeed, we find that the testimony of mother's treatment providers and the DHS representative about mother's progress in the months preceding the hearing constitutes credible evidence and is the more probative evidence regarding mother's mental status *at the time of the termination hearing*. Since December 2002, and until the beginning of the hearing in October 2003, mother was tested more than 50 times for drug use, and each test was negative for the use of drugs. Mother was involved in a daily 12-step program for a lengthy period of time before the hearing was completed, and Andrews testified that mother is "as stable as anyone's going to be[.]" What mother's conduct after December 2002 demonstrates is that she is able to make changes *despite her personality disorders*. Months after Richardson and Ewell conducted their evaluations, Andrews and Carroll found, based on their more current and frequent contacts with mother, that those changes that Richardson and Ewell said needed to occur had and were occurring.[9]

By contrast, Ewell and Richardson did not have contact with mother in the months following their evaluations and did not observe what progress, if any, mother had made during that time. As a result, they were unable to provide testimony on the key issue: whether they believed that mother's

---

[9] The dissent seeks to divorce mother's successful completion of her treatment for drug addiction from her personality disorders, claiming that the latter were left untreated. With respect, it belies common sense to believe that mother could perform as well as she did over an extended period of time after December 2002 in her therapy sessions, acquire full-time employment, and continue to visit her children in the manner described by Kniskern if her personality disorders render her as dysfunctional as the dissent asserts.

personality disorders rendered her incapable of caring for K at the *time of the hearing*.

Significantly, the dissent fails to grapple meaningfully with the conflict that its own logic has created in terms of the state's burden of proof: Although it concedes that mother made "commendable" progress in overcoming her drug and alcohol dependence, thereby demonstrating that mother's personality disorders are not so severe as to prevent her from overcoming her addictions, 203 Or App at 670-71 (Deits, J. pro tempore, dissenting), the dissent nonetheless ultimately concludes that mother's personality disorders render her incapable of making changes in her life. In reaching that conclusion, the dissent relies on mother's defensiveness at the termination hearing and the fact that certain individuals continued to reside at her home near the time of the hearing. Ultimately, the dissent concludes that mother "fails to see the consequences of her behavior and how that behavior can have a negative effect on herself and others." 203 Or App at 674 (Deits, J. pro tempore, dissenting). But the dissent's evaluation of the evidence fails to recount and consider all of mother's testimony on those subjects.

Although mother offered what the dissent considers to be rationalizations of the factual circumstances of her drug use and her prior choices, she also acknowledged at the same time that her drug use and her choices placed her children at risk of harm. The dissent correctly recounts mother's trial testimony that, " '[a]s far as the way that we lived, I think that my children were always well taken care of as far as food, clothing. They had a place to sleep.' " 203 Or App at 674 (Deits, J. pro tempore, dissenting). Mother's statement was in response to the question, "Do you believe your children suffered any damage, emotional or otherwise, as a result of your lifestyle in June of 2002?" But, as part of that very same answer, mother testified, "And I do believe that my choices have—have created harm to all of us, to even the community. But I have chosen to correct those choices."[10] Later, mother explained:

---

[10] It also should be noted that, other than K's comments that there were people at the house who ate all the food, there is no evidence that mother had failed to provide adequate food for K. During visits from DHS, and even during the raid, the refrigerator was stocked.

"The poor choices were, for one, using at all. And I actually have made poor choices, in my—my past relationships, and I've made poor choices in—definitely the people that I allowed to come into my home and be around my children."[11]

If the dissent's selective portions of mother's trial testimony were the only evidence regarding mother's "thinking," the dissent's assertion that it is highly probable that her personality disorders affect her current ability to parent would be more persuasive. But Andrews's, Carroll's, and Kniskern's credible testimony, along with mother's entire testimony, conflict with any inference arising from selective portions of mother's testimony and Ewell's and Richardson's testimony. By focusing only on selective portions of the record rather than the entire record, the dissent fails to acknowledge the mandate of the statutory language or heed the Supreme Court's instructions in *State ex rel SOSCF v. Stillman*, 333 Or 135, 36 P3d 490 (2001), and *State ex rel Dept. of Human Services v. Smith*, 338 Or 58, 106 P3d 627 (2005).

Last year, the Supreme Court in *Smith* addressed the circumstance where, as in this case, there is an absence of evidence establishing a nexus between a parent's mental disorders and the parent's capacity to parent *at the time of the termination hearing*. In *Smith*, the court admonished, "[A court adjudicating the termination of parental rights] first must identify the parent's conduct or condition, and then measure the degree to which that conduct or condition has had a seriously detrimental effect on the child." 338 Or at 81. Under *Smith*, the state must prove more than the fact that mother's condition was seriously detrimental to K's welfare at some point in the past. Rather, the state must prove that her condition was seriously detrimental to K's welfare *at the time of the hearing*. *Id.* at 83; *see also Habas*, 299 Or at 186

---

[11] The dissent also relies heavily on the fact that, at the time of the termination hearing, Stevens, a known drug user with a criminal history, 203 Or App at 663 (Deits, J. pro tempore, dissenting), was living at mother's home, 203 Or App at 670 (Deits, J. protempore, dissenting). Stevens was not living *in* mother's "home" but in a separate cottage on the property owned by mother's father. There is absolutely no evidence that Stevens ever posed a risk to K. Moreover, although he had a criminal record, the evidence indicated that his most recent conviction was in 1993.

(holding that the evidence was insufficient to terminate mother's parental rights where she suffered from periodic bouts of manic-depressive psychosis requiring medication and hospitalization because she "was never given the opportunity to 'effect a lasting adjustment after reasonable efforts by available social agencies' "). As *Smith* makes clear, "perfection in parenting" is not required. 338 Or at 87. There is no evidence that mother's rigidity or reactivity at the time of the hearing would have a serious impact on K's welfare or would, in the *Smith* court's words, be "worse than those of thousands of Oregonians who ultimately succeed, without state intervention, in raising their children safely." *Id.*

■    Also, as the Supreme Court emphasized in *Stillman,* 333 Or at 146, the statutory requirements are meant to be "child-specific," calling for "testimony in psychological and developmental terms regarding the particular child's requirements." Although the issue in *Stillman* involved the interpretation of the phrase "within a reasonable time," the opinion directs courts to make a child-specific inquiry at all levels of analysis. The court therefore emphasized:

> "[T]he focus of both parts of the test for termination under ORS 419B.504 is on the detrimental effect of the parent's conduct or condition *on the child*, not just the seriousness of the parent's conduct or condition in the abstract. *Thus, the court first must identify the parent's conduct or condition, and then measure the degree to which that conduct or condition has had a seriously detrimental effect on the child.*"

*Id.* (emphasis added). Accordingly, the effect that mother's mental disorders may have on K must be evaluated at the time of trial in light of K's particular circumstances. Unlike many children exposed to drug environments, K is remarkably unscathed by mother's prior home environment. There is no evidence that K has special needs that would present any challenges for mother beyond those ordinarily inherent in parenting. By all accounts, K is greatly bonded to mother and has consistently expressed her wish to return to mother's custody. The photographic exhibits in the record of mother and K show family activities and birthday events with K participating in age-appropriate activities. Thus, there is little evidence that mother's past conduct has had a seriously detrimental effect on K.

In summary, the record simply does not contain clear and convincing evidence that mother's mental and emotional disorders, when separated from her drug abuse, have ever or will ever have a seriously detrimental effect on K. Indeed, mother is like thousands of parents in Oregon who are "in process"—parents who may initially fail to reckon with the potential consequences of their behavior on their children but are seeking to change their behavior to become better parents. The treatment providers and the DHS representative who had the most recent contact with mother uniformly believed that she possesses the required motivation to change and that she had demonstrated her ability to change based on her conduct and behavior from January 2003 to March 2004. On this record, there is, at a minimum, a competing inference that mother was able to adequately care for K in March 2004. That competing inference precludes a conclusion that it is highly probable that mother was an unfit parent as of March 2004 and that integration of K into mother's home is improbable within a reasonable time. Accordingly, we reverse the trial court's judgment terminating mother's parental rights to K.[12]

Termination of mother's parental rights reversed and remanded; otherwise affirmed.

**BREWER, C. J.,** concurring.

Although surely not as frustrating as it is for the parties, this case also is frustrating for the court. Because we have been charged with *de novo* review of termination of parental rights decisions, two outstanding appellate judges, former Chief Judge Deits and Presiding Judge Edmonds, have painstakingly reviewed and summarized the trial court record and written cogent opinions that arrive at defensible, but diametrically opposed, conclusions about mother's fitness as a parent and the prospects for safe reunification of this family. That process has taken an extraordinary length of time, but it has been necessary for this court to acquit its statutory obligation, on a cold record, in a very close case, to

---

[12] Because of the passage of time between the termination hearing and the issuance of this opinion, there may be a need for the juvenile court to monitor the reintegration of K into mother's home. We remand for that purpose.

review one of the most important types of decision that comes before us: the determination of a child's future in the context of a struggle over family survival. I agree with the result reached in the majority opinion, but write separately to explain my vote for the sake of those who read this court's work in the area of juvenile law.

This is a case where DHS had significant contacts with mother and her family before the child was removed from her home in June 2002. However, those contacts were not so extensive or profound that mother was offered sufficient services before the trial court took jurisdiction so as to excuse further reasonable efforts by the agency to reunify the family. Mother was assessed for substance abuse and mental health needs within a few months after the dependency case was filed. However, DHS decided to seek termination of mother's parental rights only four months after the case was opened and only three weeks after Dr. Ewell issued his report recommending the intensive mental health treatment that the agency faults mother for not having obtained and benefitted from.

At a hearing in November 2002, the trial court declined to approve the agency's request for a permanency plan that included termination of mother's parental rights and the child's adoption. At that hearing, the court ordered the agency to provide mother with additional services. To its credit, the agency did so. And, as the lead opinion indicates, mother successfully completed a substance abuse treatment program, obtained employment, and apparently maintained her sobriety through the stress of the termination trial in October 2003. She also undertook mental health treatment and, although it was not the intensive form of treatment recommended by Dr. Ewell, mother did make progress. And, as Judge Edmonds points out, the agency did not suggest or offer a different mental health regimen after mother began receiving treatment in February 2003. However, the agency, honorably striving to acquit its dual and often conflicting duties to attempt to reunify a family and provide permanency for a child, filed a termination petition on January 31, 2003, less than eight months after the dependency case was filed.

The point is this: parents with entrenched multiple diagnoses and problems have become the norm in termination of parental rights cases. Such parents, like mother in this case, generally present with both mental or emotional issues and substance abuse problems. To expect parents to resolve within a few months serious, layered, and complex psychological issues that often have taken a lifetime to develop simply is not realistic. On the other hand, the agency is charged with protecting society's most precious resource, the safety and well-being of a child, and it cannot be expected to wait indefinitely, pouring finite resources into a parent-child relationship that has little chance of resumption within a reasonable period of time. In circumstances such as these, the agency can expect to be criticized for acting either too precipitously or too slowly regardless of the permanency plan that it pursues. So, what to do?

In a case like this, the key for me is the health and condition of the child. If the child has few if any special needs and is psychologically healthy, as is undisputedly the situation here, it is better to err on the side of giving a parent who is making progress toward addressing multiple deficiencies a more comprehensive opportunity to remediate them than would otherwise be the case. Except in cases where the court initially finds that no further services are required, ORS 419B.470(2) gives the agency up to 12 months after the child is found to be within the jurisdiction of the court under ORS 419B.100 or 14 months after the child is placed in substitute care, whichever is the earlier, to conduct a permanency hearing. In my view, this is a case in which the agency should have taken more of that time to give mother a chance to succeed or fail in the more intensive mental health treatment that its own expert recommended. Had it done so, and if mother nonetheless had shown the halting and inconsistent insight concerning the effect of her past conduct on the child that she did in her trial testimony, I could have supported termination of her parental rights. However, here, the quest for termination feels too quick and certain for my comfort in light of the progress that mother did make toward remediating her parental deficiencies.

Sadly, there is genuine risk that mother might well fail in that effort, and the obvious truth is that, on this frozen

record, we cannot know whether mother is even presently amenable to treatment. However, we nonetheless must perform the task that the legislature has given us. With far less confidence in the wisdom of our decision than anyone would wish for, but mindful of the heavy evidentiary burden that must support a judgment terminating a parent's parental rights, I concur.

**DEITS, J. pro tempore,** dissenting.

After hearing all of the evidence in this case and observing the witnesses, the trial court concluded that, despite mother's success in overcoming her substance abuse problems, she had "significant durable psychological problems" that had not been successfully treated and that required extended treatment. The trial court also found that mother continued to demonstrate poor judgment in allowing dangerous individuals to be in her home and that she has demonstrated a "significant tendency towards minimization and lack of responsibility." Based on those findings, the trial court concluded that mother was not a viable safe parenting choice. In my view, the record fully supports the trial court's conclusion that, at the time of the termination hearing, mother's mental and emotional disorders rendered her incapable of providing care for K for extended periods of time and that mother's conditions were unlikely to change within a reasonable time. Accordingly, I dissent.

The majority gives little attention to the details of the history of mother's conduct while K was in her custody, stating that "there were a number of conditions in mother's home that made it unsuitable for children." 203 Or App at 642. "Unsuitable conditions" can mean many things. The details of an individual's behavior and performance as a parent are an important consideration in a termination case. That is not to say that individuals will be damned forever by their past behavior or that they cannot and do not change and improve. However, in assessing whether sufficient improvement has occurred to allow a person to continue to act as a parent, it is necessary to understand the person's past deficiencies as a parent and view changes and improvements in that context. Accordingly, it is critical here to fully comprehend the difficulties that mother has had as a parent,

the cause of those difficulties, and the bases for the removal of the children from her home, in order to accurately assess whether she has presently overcome the deficiencies that made her incapable of caring for her children and required their removal.

Mother's child K was born in 1996 and apparently lived with mother until her removal by the Department of Human Services (DHS) from her home following a police raid in June 2002. Mother's deficiencies as a parent, however, did not begin in 2002. Prior to the time of the police raid, representatives of DHS and the local police had had numerous contacts with mother. For example, three years before, in May 1999, when K was three years old, Lincoln County police visited mother's home in response to a disturbance call involving mother's teenage son, D, and mother's boyfriend. The police described the home as being in "somewhat of an unlivable condition." The officer who visited the home said that "if something hadn't been done really soon—it was not a livable home, especially with children."

In July 1999, DHS contacted mother about a person living at mother's house who was a predatory sex offender on parole who had a preference for young children. After the contact, mother asked the person to leave, apparently because he did not have a job, not because of his sex offender status.

Another example of such contacts occurred in early 2002. In February, DHS received a report that the "conditions of [mother's] home were filthy" and that mother was allowing homeless persons to live in the house with her and her children, which included K, her infant son J, and D. The DHS representative, Davis, found that the house was filthy. She testified that there was "garbage all over, inside and outside" and that there was rotting food in the house. She also said that there were rotting diapers in the house and that there was not a clear place to walk in the house. Davis testified that it was not possible to open the front door of the house because of all the garbage—that it was necessary to enter the house through the back door. She also found two people who appeared to be "highly intoxicated" passed out in the room of mother's teenage son D. Apparently, those two

individuals were using drugs and alcohol and living in the same part of the house as D. Mother was told at this time that her son D was using drugs with these persons. Davis testified that she talked to mother about the situation and that mother knew that these were inappropriate conditions for her children to be living in. Mother was also told at that time that the failure to keep inappropriate individuals out of her house could result in the removal of her children.

The testimony of a number of mother's neighbors also confirmed the conditions at her house. They testified that the children were dirty and that they had seen K out of the house a number of times at all hours of the day and night by herself, even at 3:00 or 4:00 a.m. while parties were going on at the house. A neighbor testified that she had seen K outside by herself dressed only in a diaper in the pouring rain. After K was removed from the home, K also confirmed the chaos in the house. She told the police that lots of people visited her mother and went with mother into her bedroom and that, on a number of occasions, she had "seen her mom give herself shots in the kitchen" on "the inside of her arm." She also told her foster mother that there was not a lot of food in the house and that she was scared to sleep there because there were no locks on the doors and there were a lot of people there who ate all of their food.

The drug raid took place in June 2002. Mother was the object of the search based on probable cause that drug activities were occurring on the property. The police found a number of persons inside the house besides mother and her children. These persons included Carney, a known drug user with a criminal history; Zimmerman; Surber, who apparently was living at the house; and Stevens, also a known drug user with a criminal history. Stevens had spent the night in a cottage behind the house with mother's son D, who was 14 at that time. Davis, who was present at the time of the search, testified that the children were dirty and that the house was filthy from " 'years' worth of filthiness." The baby food and baby bottles had mold growing in them and were within reach of a child. K told the police at the time that she had not had any dinner or breakfast. During the search, the police found a bag in the house containing a mirror with drug residue and a baby's pacifier. A backpack containing needles was

found on the floor in the house and a needle was found in what at least some witnesses believed to be a child's glove. Mother's son D was found with a marijuana pipe in his possession and a baggie containing methamphetamine residue. D told the officers that he occasionally used methamphetamine and regularly used marijuana. He said that he got his marijuana at a state park with one of the men who was present in the house at the time of the raid and that he stole his methamphetamine from his mother's supply.

The majority finds that, since the time of the removal of the children, mother has made significant progress in overcoming her drug and alcohol dependency. I agree that the evidence establishes that, as did the trial court. The majority goes on to conclude, however, that the record does not establish that mother's mental health issues render her incapable of providing care for K for extended periods of time. I disagree with that conclusion. As I will discuss, the expert testimony in this record provides consistent evidence of mother's mental health diagnoses. There is no evidence that the diagnoses are wrong, that they have changed, or that mother's mental health issues have been successfully treated. Further, there is clear and convincing evidence that mother's behavior and attitude, which the experts testified were symptomatic of her mental health diagnoses, continue and that that behavior and attitude continue to pose serious risks to K.

The evidence demonstrates that mother has been diagnosed with long-term mental health problems that have seriously interfered with her parenting ability. Those mental health problems include post-traumatic stress disorder, anxiety disorder, and a personality disorder with obsessive-compulsive components. As the majority notes, mother was evaluated by Dr. Ewell, a psychologist, in September 2002. As Ewell explained at trial, mother's diagnosis of post-traumatic stress disorder explains her "history of being unable to keep transients away from her residence." He stated that persons with this diagnosis often "seek to be accepted within relationships and * * * are vulnerable to be[ing] taken advantage of." Ewell also discussed mother's behavior in which she pulls out her own hair. He said that mother had told others that she did that because the hair was growing in

her brain and that she denied that she did it as a result of stress. Ewell opined that the hair pulling could be a condition called "trichotillomania," in which a person pulls out her hair as a result of anxiety, or it could be a symptom of an obsessive-compulsive disorder or a borderline personality disorder.

Ewell reported that mother's MMPI scores indicated that she presented a profile of a person with certain personality deficiencies:

"[A]s a relationship's depth and closeness increase[,] their underlying hostility, egocentricity and even ruthlessness become apparent. Their ability to acquire personal insight is limited since they are psychologically unsophisticated and tend to resent suggestions that their difficulties may be even partially psychological in nature. *There is a tendency to blame personal problems on others.*"

(Emphasis added.) Ewell also pointed out that mother's psychological tests suggest a personality disorder with borderline and antisocial features. He explained that people with borderline features "have difficulty staying in long-term functional relationships." Ewell indicated that people with antisocial personality features often show poor judgment and have difficulty *"being able to see the consequences of one's behavior [or] how that behavior might have a negative influence on yourself or others in your family[.]"* (Emphasis added.)

Ewell recommended that, in addition to treatment for her chemical dependency, mother needed long-term intensive individual treatment for her anxiety disorders and personality disorders. He explained that most people with her condition need years of treatment and that there would need to be at least a year of treatment on a weekly basis followed by follow-up treatment. Ewell opined that, unless both mother's chemical dependency and her psycho/behavioral condition were treated, "relapse would be almost certain." In his September 2002 evaluation, he said that, "[a]t this point, I do not believe [mother] would be capable of adequately providing for the children."

Although, as noted by the majority, there were some differences in diagnosis, Ewell's assessment of mother was, for the most part, consistent with that of Dr. Richardson, a psychologist who first saw mother in 1999. At that time, he

authorized eight mental health sessions and said that he could have authorized more if she had followed through with the sessions, which she did not. He evaluated her again in February 2003. At that time, he concluded that, in addition to her substance dependency problems, mother had an adjustment disorder with mixed emotional features as well as an obsessive-compulsive personality disorder with narcissistic and histrionic elements. Richardson said that an obsessive-compulsive personality disorder is a personality pattern that is determined over a long period of time and that personality patterns tend to be entrenched.

Richardson explained that personality disorders affect a person's parenting ability by creating a likelihood of "a little bit more * * * rigidity and reactivity than [is] healthy" for a child. He also diagnosed mother's hair pulling as "trichotillomania," which he said would require treatment for a minimum of six to nine months on a weekly basis. He said that treatment normally takes about a year. He testified that the presence of this condition suggests that "anxiety would be a part of the family lifestyle." Both Ewell and Richardson testified that mother needed intensive mental health treatment in order to overcome her problems.

Richardson testified that the first step in a recovery program is what he called "internal motivation." He explained that that is when a person "start[s] to realize the damage that they did to themselves and others as a result of drug and alcohol use and have taken steps to make amends to those individuals." Contrary to the majority's assertions, Richardson had some awareness of mother's progress with her chemical dependency. He testified that, when he evaluated mother in 2003, she told him that she was no longer using drugs and that her children were unaffected by her drug use.

The majority takes the position that the evidence does not show that mother's conditions render her incapable of parenting K. It reaches that conclusion based on its view that Ewell's and Richardson's testimony as to her mental health conditions and the effects of those conditions on her behavior are not persuasive because their evaluations of

mother took place some time prior to the time of the termination hearing and before mother had attained sobriety. The majority also relies strongly on the testimony of Andrews and Carroll, counselors who saw her closer to the time of trial, to support its conclusions that mother's mental health condition no longer rendered her incapable of parenting K for extended periods of time. For the reasons that I will explain, I disagree with both of those conclusions.

To begin with, I simply do not agree that the fact that the experts' evaluations, including their diagnoses and explanations of the effect of mother's conditions on her behavior, occurred some time prior to the termination hearing renders them unpersuasive. It is not unusual that a mental health evaluation occurs some time before a termination hearing takes place. Evaluations of a parent's deficiencies typically are done during the time that the appropriate agencies are assessing the nature of the person's problems, determining what measures should be taken to assist the parent and the family and, eventually, if the assistance does not prove effective, deciding whether termination should be sought. Evaluations that occur during this process are commonly considered in termination cases. We have never required that such evaluations take place at or near the time of the termination hearing to be persuasive. Of course, the persuasiveness of an earlier evaluation depends very much on the particular facts of the case, including the substance of the diagnosis and the evidence of what has occurred since the time of the evaluation. In particular, we consider whether there is more recent expert evidence that demonstrates that the mental health evaluation was inaccurate or that the person's mental health status has changed.

As discussed above, the testimony of the experts, Richardson and Ewell, regarding mother's diagnoses consistently was that she had serious mental health issues that required long-term intensive treatment. There is no evidence that the diagnoses were wrong or that mother's diagnosed mental health conditions have changed. The majority seems to believe, or at least assume, that the fact that mother did attain sobriety somehow affects the accuracy of Ewell's and Richardson's mental health diagnoses or, in itself, shows that mother's mental health condition has changed. However, the

evidence is clear that mother had dual diagnoses; both experts considered mother to have dual diagnoses of chemical dependency *and* mental health disorder. They also believed that it was necessary for mother to overcome *both* of her problems to achieve a long-term and permanent recovery. Ewell testified that treatment of one of the diagnoses without treatment of the other is "almost always ineffective" and "sets the person up for a relapse or deterioration in the future." He reported that, unless both mother's chemical dependence and her psycho/behavioral conditions were treated, "relapse would be almost certain." There is no evidence that contradicts this statement.

In addition, in concluding that mother's mental health issues no longer rendered her incapable of parenting for an extended period of time, the majority finds that mother did obtain appropriate mental health treatment and that the testimony from Andrews and Carroll shows that her mental health issues no longer render her incapable of providing adequate care for K. Again, I disagree. I would first note that the majority's conclusion that mother obtained the mental health treatment recommended by the experts is contrary to the trial court's finding that mother did not obtain the required mental health treatment, a finding that is directly supported by the testimony of Ewell and Richardson and by the evidence of the treatment that she did obtain.

In reaching its conclusion that mother did obtain the recommended treatment for her mental health conditions, the majority relies on testimony from Andrews, mother's drug and alcohol counselor, and Carroll, who was a counselor with Lincoln County Health and Human Services. There are a number of problems, however, with the majority's reliance on that testimony for that purpose.

First, the majority's assertion that mother was receiving mental health counseling from Andrews simply is not correct. Although Andrews had some mental health training, the evidence clearly establishes that she was not acting in that capacity with respect to mother. Andrews herself testified that the services that she provided mother were for drug and alcohol counseling. She said that she was not a licensed psychologist and that she was "not certified to do

mental health counseling." Understandably, because she was not acting in that capacity, Andrews never discussed mother's mental health diagnoses or the status of those diagnoses. Consequently, her testimony is of limited relevance in determining the status of mother's diagnosed mental health condition. Further, although she spent considerable time with mother, she never saw mother interact with K, nor did she ever meet K. In addition, although Andrews expressed the view that mother was "very honest" throughout their relationship, it is apparent from her testimony that mother did not provide her with a very accurate or complete picture of her history, including her relationship with and care for her children. One example of this is that mother told Andrews that she always kept K separate and protected from the many people who were in her home. That, of course, is completely inconsistent with the evidence from DHS workers, the police, the neighbors, and K herself, of K's unsupervised wanderings inside and outside the house and the apparent free rein that mother allowed the individuals present in her house, including drug users and sex offenders.

I also do not find Carroll's testimony highly persuasive on the issue of whether mother's mental health issues had resolved to the point that she could provide proper care for K. Carroll testified that she believed that mother had made significant progress, but that she was not all the way there. She said that she believed that mother had begun to accept responsibility for what had occurred with respect to her children. However, it appears that mother also did not provide Carroll with completely accurate information. For example, when asked at trial if it would cause her concern to learn that mother was denying responsibility for some of the problems in her life, Carroll said that she would be "sorry to hear that" and agreed that that would be an issue "that obviously needs some more work."

Another area about which mother apparently did not accurately inform Carroll concerned persons who were living at her house at the time that Carroll was seeing her. There was evidence that mother's boyfriend, Walsh, who was living with her, had some of the same difficulties as some of the individuals with whom mother had been associating. The evidence shows that Walsh had previously been involved

with DHS on issues concerning a past relationship and his children from that relationship and that he was convicted in January 2003 of carrying a concealed weapon and possession of a controlled substance.[1] Apparently, mother did not tell Carroll during her counseling sessions about Walsh's background. She also did not tell Carroll that Stevens was living on her property.[2] Carroll agreed that it "distressed" her that Walsh and Stevens were living at mother's home and that mother did not tell her about those circumstances. She said that, had she known about Walsh's background, she would have "been more assertive about exploring those issues with her."

When Carroll was asked at trial what she would have told mother if she had known that a transient with a history of drug use and criminal behavior was living with her at the time that she was seeing her, she said that she would have "encouraged her to think about doing something differently." In response to a question as to whether it would have hampered mother's ability to get her children back, she said that it would have and that "I would have gone that direction, yeah."

As noted above, the majority relies strongly on mother's progress in addressing her substance abuse problems in holding that mother's mental health issues did not render her incapable of caring for her children. While that progress is certainly commendable, as both Ewell and Richardson, as well as the trial court, recognized, that progress cannot be evaluated in a vacuum. There is, in fact, no evidence that indicates that mother's progress with her chemical dependency problems had any direct effect on her mental health problems. Mother's progress with her chemical dependency issues must be considered in view of mother's other problems, in particular her mental health problems, which the experts viewed as a separate diagnosis. In that

---

[1] Walsh testified that he was wrongly convicted of the possession charge because the methamphetamine found in the pocket of his pants was not his.

[2] The majority disputes that Stevens was living on mother's property because Stevens apparently was living in a cottage that was not part of the house. 203 Or App at 656 n 11. The evidence demonstrates, however, that the cottage was on her property and functioned as part of the living space on the property. Mother's teenage son, D, apparently used the cottage as his bedroom.

regard, I disagree with the majority's suggestion that mother was not on notice that she needed mental health counseling in addition to services related to her chemical dependency. 203 Or App at 653-54. It was consistently made clear to mother as early as 1999 that she needed intensive mental health services, and she did not pursue those services that were offered to her. As late as February 2003, Richardson indicated that mother needed mental health services ranging in duration from six to 12 months. At a certain point, and especially when a small child is involved, DHS is entitled to proceed to seek termination without further specific offers of service, once a parent has rejected previous offers and shows no signs of pursuing recommended treatment.

Mother's progress with her chemical dependency must also be viewed in the context of the evidence of her behavior. As the Supreme Court indicated in *State ex rel SOSCF v. Stillman*, 333 Or 135, 36 P3d 490 (2001), substance abuse rehabilitation alone is not always sufficient to establish that termination is unwarranted; all of the circumstances of the particular parent and child must be considered. In *Stillman*, the court suggested that, because of significant risks to the father's children inherent in his operating a drug laboratory in his home and because of associated risks of having dangerous individuals in the home, an attempt to terminate the father's parental rights at the time that he was arrested might have appropriately led to termination of parental rights. *Id.* at 148. However, because of "all that has occurred since that time," the court concluded that the state had not carried its burden to show that the father was presently unfit. *Id.* Those circumstances included the following: the father had been highly successful in participating in drug rehabilitation, including seeking additional therapy beyond what was recommended; he "sincerely came to appreciate the effect that his drug use had had on his children"; and he "was addressing the deficits in his life so that he could maintain custody of the children." *Id.* at 141. Moreover, other than chemical dependency, the father had no mental health problems that would interfere with his parenting ability. *Id.*

In contrast, here, it is evident from mother's conduct and her testimony at trial that mother does not appreciate the effect that her drug use has had on her children, nor has

she addressed the deficits in her life that result from her other mental health issues, including allowing inappropriate persons to be in her home. Further, unlike the father in *Stillman*, mother has been diagnosed with several mental health problems that interfere with her parenting ability—problems that, as noted, remain largely unresolved.

In summary, I believe that there is clear and convincing evidence of the nature of mother's mental health issues and the manner in which these conditions affect her behavior as a parent. There is no evidence that her mental health diagnoses have changed. In addition to that, I believe that it is of great significance, as did the trial court, that the evidence shows that mother's behavior that was symptomatic of her mental health conditions has not changed. As the trial court found, mother's behavior supports the conclusion that her mental health issues were not resolved and apparently continued to interfere with her understanding of the risks to which her behavior exposed her children.

As discussed above, even before the drug raid occurred, mother had been told by representatives of DHS that she must not allow transient persons, particularly those with criminal records, to be at her home. Following the raid, that was a key part of the agreed-upon plan with DHS for the return of her children. Mother's counselors and DHS representatives continued to emphasize and work with mother on the importance of that factor in obtaining the return of her children. That was one of the major focuses of the counseling that she received. Despite the emphasis on this factor, the evidence shows that such persons continued to be present in mother's home. For example, Stevens, one of the persons who was present at the time of the drug raid and who had a criminal history, was living in mother's home just a few weeks before the termination trial and was on the property just before the trial. He was stopped by the police a few days before the trial and gave mother's address as his. Stevens testified that he had been living in mother's home quite recently. Although Stevens said that he had left a few weeks before trial (not because mother had asked him to leave, but because he was on a list of persons who were not to be at mother's house and he was concerned that his being there might interfere with mother's ability to obtain the return of her

children), on *de novo* review, I would find that the evidence establishes that he had been living there more recently. Not only did Stevens admit that he had been living at mother's home, at trial, mother's neighbor testified that she had seen him "today in the same street that [mother]'s house is" on and the previous night he had been "at my back fence * * * just staring."

Mother's failure to understand the risks that her behavior posed to her children and her unwillingness to accept responsibility for the "unsuitable conditions" continued as late as the time of the termination hearing. For example, mother explained at the termination hearing that, when representatives of DHS came out to check on the condition of the house and found two drunk people in the room where her teenage son slept, she told them that she had never seen them before and that she did not know how they got there. Another example is her explanation of why K told the police that she had seen mother put "shots in her arm." Mother testified that she had never used a needle and that K could not have seen her do so. She explained that K had been confused and must have been talking about a toy doctor's kit that they played with in the kitchen. She also testified at trial that she never used drugs in front of the children. However, in her interview with Ewell, K told him that she had watched mother using drugs. Ewell said that it seemed to him that this was a stressful issue for K.

Mother also testified at trial that, when she did use drugs, she was able to care for K, who was under five years old at the time. At trial, the following colloquy took place:

"Q. Who was watching [K] while you were using?

"A. Well, there—I would have somebody there. I would never leave her alone for that. And that's why—if I may say—is that I often would go into my bedroom and close my door, and she was not allowed in.

"Q. But who was watching her while you were doing that?

"A. Well, she was old enough to be in the living room by herself, or you know, doing an activity or TV, and I went in and did my line and came back out.

"Q. What if there was an emergency and you were incapacitated?

"A. Doing a line isn't like using needles, you were very accessible to an emergency if there was—she was—she's old enough—she—it would be like if you were off doing the dishes or—going to the bathroom or anything else in the time frame."

Further, mother testified that she did plead guilty to child neglect following the drug raid but that she was not really guilty of that. In March 2003, mother told her caseworker at the time that the drug raid had been a "setup" and that the drug paraphernalia had been planted in her house.

Despite the evidence from many sources, including her own children, of the horrible conditions at her home before the time of the children's removal, mother asserted, as late as at the termination hearing, that her house "was not a health hazard to the children" and that, "[a]s far as the way that we lived, I think that my children were always very well taken care of as far as food, clothing. They had a place to sleep." The majority attempts to explain away this testimony by mother by stating that she did make a general statement that she accepted some responsibility for the risk that her children were exposed to and that her testimony simply reflected "defensiveness." 203 Or App at 655. Her specific comments, however, belie the general statement that she made and demonstrate much more than defensiveness. The comments show a very serious failure to understand and take responsibility for the risks to which she exposed her children. This continued failure by mother is completely consistent with Ewell's description of the effects of mother's personality disorder, namely, that she fails to see the consequences of her behavior and how that behavior can have a negative effect on herself and others.

I strongly disagree with the majority's view that mother is an "in process" parent who may "initially fail to reckon with the potential consequences of their behavior on their children but are seeking to change their behavior to become better parents." 203 Or App at 658. The record in this case shows that mother has failed to reach even the first step of the recovery process of a parent—namely, recognizing the

serious consequences of his or her behavior to their children. It is clear that she does not understand or is not willing to accept the effect that her drug use has had on her children, nor has she addressed some of the most serious problems in her life in terms of her other mental health issues, including allowing inappropriate persons to be in her home. Further, unlike the father in *Stillman*, mother has been diagnosed with several mental health problems that interfere with her parenting ability—problems that, as noted, remain largely unresolved.

The majority also expresses the view that the record does not demonstrate that mother's conduct and condition have been seriously detrimental to K because K appears to be all right despite the circumstances that she was subjected to in mother's care. In order to establish that the termination of parental rights is appropriate, however, it is not necessary to show that a child has already suffered cognizable harm. Termination may be warranted if the parent's conduct or condition place a child at sufficient *risk* of harm. *See State ex rel SOSCF v. Blum*, 175 Or App 447, 456, 28 P3d 1231 (2001), *rev den*, 333 Or 399 (2002).

The majority also emphasizes that the state must prove that mother's condition was detrimental to K's welfare at the time of the termination hearing. I believe that the state met that burden. Mother's continued inability to keep dangerous individuals away from her home, knowing how critical doing so was to her being able to obtain custody of K, and her apparent continuing belief that she could take proper care of a small child while using drugs illustrate the risk of harm to K's welfare at the time of trial.

The evidence here shows that, prior to their removal from mother's care, the children were at a significant risk of harm. The fact that K at least does not appear to have been harmed by the circumstances does not establish that she was not subjected to a serious risk of harm. Ewell testified that, based on his evaluation of K, if she were returned to mother's home and things were to "blow up again," that could have an adverse effect on K.

In addition to the fact that, based on my review of this record, I find that there is clear and convincing evidence

to support termination of mother's parental rights, I also believe that this is a case where the credibility of the witnesses is quite important and that we should give considerable deference to the trial court, which had the opportunity to observe the witnesses firsthand. *State ex rel Juv. Dept. v. Boren*, 105 Or App 599, 601, 806 P2d 149 (1991). Here, the trial court, after hearing all of the evidence and observing the witnesses, was very clear in its view that, despite mother's sobriety, her "deficiency of judgment" regarding dangerous individuals has not significantly improved nor has her tendency to minimize or rationalize risks that her behavior creates for herself and her children. The trial court found that mother has "significant durable psychological problems which will require extended treatment," that mother has not successfully obtained treatment, and that, at the time of trial, she was not a "viable safe parenting choice."

For all of the above reasons, I would hold that there is clear and convincing evidence establishing that mother's long-term mental and emotional difficulties are of such a nature and duration that they render her incapable of providing care for K for extended periods of time, that reintegration into mother's home is improbable due to conduct and conditions that are not likely to change, and that it is in the best interests of K to terminate mother's parental rights. This is not a case where we have a theoretical diagnosis and must speculate as to the effect of the condition on a person's parenting performance. Here, there is evidence that clearly demonstrates the detrimental effect of the condition on the person's parenting skills and its effect on and the risk that it poses to her children. I agree with the trial court that mother's parental rights should be terminated and would affirm the trial court. Accordingly, I respectfully dissent.