Argued and submitted May 8, affirmed September 27, 2006

In the Matter of
Michelle Renee Radiske,
a Minor Child.

STATE ex rel DEPARTMENT OF
HUMAN SERVICES,
*Respondent,*

*v.*

Troy M. RADISKE
and Mary Louise Austerman,
*Appellants.*

04-111J; A130776

144 P3d 943

James A. Palmer argued the cause and filed the brief for Troy M. Radiske.

Inge D. Wells argued the cause for Mary Louise Austerman. With her on the brief was Wells & Wells.

Judy C. Lucas, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Ortega, Presiding Judge, and Brewer, Chief Judge, and Murphy, Judge pro tempore.

BREWER, C. J.

**BREWER, C. J.**

Mother and father separately appeal from judgments terminating their parental rights to their 11-year-old daughter, M, on the grounds of unfitness, ORS 419B.504, and neglect, ORS 419B.506. On *de novo* review, ORS 419A.200(6)(b), we affirm.

## I. FACTS

The relevant facts follow. M was born in 1995 and is the only child of mother and father, although both have children from other relationships.[1] Mother and father lived together for two years, but separated soon after M was born. M remained with mother after the separation.

Mother, who was 39 years old at the time of the termination hearing, has been intermittently homeless since separating from father. The Department of Human Services (DHS) has had numerous contacts with mother, often in response to referrals expressing concern about her homelessness and the condition of her children. For example, in 1995, when M was two months old, DHS received a referral that mother was homeless, her children all had lice, and M was seriously underweight.[2] In 1997, DHS received a referral that M, then aged two and one-half, looked emaciated and had sunken eyes with dark circles and a bad color. The referral also stated that she had a chronic head lice problem and that all of the children had open sores from the lice.

In the spring of 1999, DHS received three referrals during one two-week period. The first referral involved mother's older daughter, J, allegedly being strangled and struck by mother's then-boyfriend, Mike Scott. The second

---

[1] Mother was married for eight years before her relationship with father and has two older children from that marriage, a daughter, J, and a son, T. Both children were living with mother at certain times during the pendency of this case; however, J eventually was emancipated, at age 16, and T has lived with his paternal grandmother in California since 2002. In 2004, father reported having two other children, ages five and 15, although he indicated that he had not seen the 15-year-old in nine years and had only seen his five-year-old child once when the child was six months old. None of the parents' older children is a subject of this proceeding.

[2] DHS also had contact with mother before 1995 regarding her older children.

referral reported that mother was homeless with her three children and that she had tested positive for tetrahydrocannabinol (THC). The third report also concerned the family's homelessness and the fact that J was living with a friend and did not know where her mother was.

On May 18, 1999, a DHS caseworker visited mother to discuss those referrals. Mother was living with the children and Mike Scott in a trailer set up on a church parking lot. The trailer had only cold running water and a portable toilet outside. Mother reported that she was unable to work due to numerous medical issues and constant pain and that she was homeless as a result. She was in a second chance renter's rehabilitation program and was hoping that she would be able to find housing after completing the program. She was also participating in DHS's self-sufficiency program, which helps families find employment and become self-sufficient.

A youth advisor from the church where the trailer was parked later visited mother and reported to DHS that the home was in poor condition with "to the ceiling piles of clothing and dishes." The advisor was concerned that M lacked adequate clothing for the winter and that, on the night she visited, Mike Scott was sitting in the trailer, apparently unclothed with just a sleeping bag over his lap. One of J's teachers also visited the family while they were living in the trailer and stated that it was "incredibly filthy and very, very cluttered" and that M appeared "extremely unkempt."

In December 1999, mother and her children, along with a different boyfriend, Rick Spencer, moved into a house owned by Robert Scott.[3] In August 2000, a DHS worker visited the home in response to a report that Scott, a convicted sex offender, had been in the home. Mother told the DHS worker that she was renting the house from Scott, that she was aware that he was a registered sex offender, and that she had called his probation officer to make the report because she knew he was not supposed to be around children.

---

[3] Robert Scott and Mike Scott are brothers-in-law. Mother was romantically involved, at different times, with both men. To eliminate confusion, we refer to Robert Scott as "Scott" and Mike Scott by his full name through the remainder of this opinion.

Because of Scott's access to the house, DHS instructed mother to move out by the end of the month.

Mother and the children subsequently moved to an apartment. In September 2000, a counselor from J's school made several referrals to DHS and eventually visited the apartment. The counselor described the condition of the apartment as "pretty incredibly dirty." He said that the living room had "dirty glasses and dishes and clothes and toys all over it, and then the kitchen had empty pizza boxes and dirty dishes and empty vodka bottles, empty beer bottles, [and] beer cans." He observed the girls asleep on a mattress on the floor in a bedroom with a half empty bottle of vodka next to them at 11:00 in the morning.

On May 24, 2001, a police officer visited the apartment. After the officer questioned mother about the smell of marijuana coming from the apartment, mother admitted that there were a number of children in her bedroom smoking marijuana. The officer cited mother for eight counts of endangering the welfare of a minor and one count of possession of marijuana. The minors included M, J, and T, who were in the bedroom at the time.[4] Mother told the officer that she had allowed the children to smoke marijuana in her apartment because pain had clouded her judgment. The police officer recalled the apartment as "being messy, trash, lots of things on the floor."

Between June and October 2001, Mother was again involved in the self-sufficiency program. On June 7, a self-sufficiency program caseworker, a mental health specialist, and a child welfare representative met with mother to discuss a plan for her. At that time, DHS had not "opened a [child welfare] case" involving mother, nor did they intend to do so if mother engaged in community services. In August, mother was evicted from her apartment. She subsequently left the state with her three children.

Mother and the children lived with her ex-mother-in-law in California for several months. She then took M and J to Pennsylvania to stay with other relatives.[5] Mother, M,

---

[4] The evidence does not disclose whether any of mother's children were smoking marijuana.

[5] Her son, T, remained with his grandmother in California and, as noted, was still living there at the time of the termination hearing.

and J returned to Oregon in October 2002. They stayed with a friend, Brian Nelson, and his girlfriend for almost a year. Because mother did not own a car, Nelson helped by driving M to school. Eventually, Nelson asked mother to leave his home because of continuing problems with J. Mother, M, and J then moved into an apartment with other friends. Jim Duke, a family friend and M's godfather, began driving M to school. Eventually, Duke suggested that M stay with him because it would be more convenient for him and because he did not think it was good for M to live in the apartment.

On April 7, 2003, a self-sufficiency program case manager, Lisa Kimbrough, visited mother. At that time, mother was receiving temporary assistance for needy families, food stamps, and health care, as well as child care and transportation assistance. The cleanliness of the home was up to DHS's standards. However, Kimbrough noticed objects related to marijuana in the home, and mother admitted to smoking marijuana to increase her appetite and discussed getting a medical marijuana card.[6] Mother stated that she was afraid she was going to be evicted again because of "partying, drinking, and drugs going on with teenagers and people in and out of the house." Kimbrough referred mother for a full psychological evaluation to assist in making recommendations for case planning. According to Kimbrough, mother was also required to participate in domestic violence counseling and drug treatment in order to continue receiving benefits.

Psychologist David Truhn evaluated mother on April 23, 2003, and he diagnosed her with major depressive disorder, recurrent-severe, without psychotic features; post-traumatic stress disorder, acute and chronic; cannabis abuse with a "rule-out" diagnosis of possible cannabis dependence;

---

[6] We assume that mother was referring to the "identification card" issued by DHS under Oregon's medical marijuana program. The program protects medical marijuana users who comply with the requirements of the Oregon Medical Marijuana Act, ORS 475.300 through 475.346, from state criminal prosecution for the production, possession, or delivery of a controlled substance. To obtain a registry identification card, the patient's physician must state in writing that the patient has been diagnosed with a qualifying debilitating medical condition and that medical marijuana may mitigate the symptoms or effects of that condition. ORS 475.309.

alcohol abuse; generalized anxiety disorder; and a personality disorder, not otherwise specified, with dependent and avoidant features. The intelligence testing he conducted indicated that mother was functioning in the low average range, but that anxiety and depression could have affected her overall functioning and decreased her score. He noted that mother had experienced depressive episodes, usually lasting between three and four months, since she was 18 or 19 years old. He also noted that she had taken antidepressant medications for many years, with moderate success, and had been involved in mental health therapy, also for many years.

Mother told Truhn that she was unable to work because of physical problems, primarily related to her stomach and gastrointestinal system, and because she felt overwhelmed. She had been unemployed since 2001, when she had held a telemarketing position. Before then, she primarily had worked in the food service industry. Her longest period of continuous employment was one and one-half years.

Mother stated that she had difficulty maintaining her weight because of depression and anxiety. She reported that she began using marijuana at age 12, she had used it daily when she was married, and, at the time of the evaluation, she was using it three times per week, often twice a day or more, to help her eat. She reported severe conflict with her daughter, J, who had been diagnosed with bipolar disorder, but stated that M was "great" and had many friends.

Mother told Truhn that she was sexually abused when she was 12 years old and raped at 16. She also reported that her first husband was physically, sexually, and emotionally abusive to her and that she had right shoulder damage from that abuse. Because of physical pain, she needed help with housekeeping and cooking, but was able to do her own shopping.

Based on the severity of mother's depression, somatic complaints, and anxiety, Truhn recommended intensive individual psychotherapy, such as a day treatment program or other significant therapeutic intervention, and continued medication management. He further recommended family therapy with her daughters to improve her parenting

skills and chemical dependency treatment to help her abstain from the use of mood-altering substances. He opined that, "given the current stressors and types of symptoms that she is experiencing, the use of any mood altering substances could exacerbate the problems and prevent therapeutic intervention."

Mother attended some domestic violence group therapy sessions, but the record does not indicate whether she completed the program. She did not complete drug treatment, although DHS referred her to three different programs.[7] Whitney Ziemak, a counselor who performs mental health and drug and alcohol screenings for DHS, explained that the treatment referrals were "primarily a formality" and not a priority for mother because she was waiting to obtain a medical marijuana card. Mother continued to use marijuana, and her urinalyses tested positive for THC during that period. In January 2004, mother received a medical marijuana card, and DHS released her from the condition that she participate in drug treatment.

Meanwhile, in the spring of 2003, mother was again evicted from her apartment, and she moved in with Scott in his motor home. Scott told mother that he had three felony convictions for encouraging child sex abuse and that he was a registered sex offender. M continued to stay with Duke.[8] However, mother saw M almost every day and M sometimes spent weekends with mother and Scott in the motor home.

On February 17, 2004, while participating in a support group at her elementary school, M disclosed that Scott had touched her inappropriately. Steve Cram, the counseling

---

[7] DHS first referred her to the Center for Family Development, which had a dual-diagnosis treatment program to address co-occurring drug and alcohol and mental health issues. When that agency was not able to provide the intensive treatment DHS recommended, DHS referred her to Willamette Family Treatment Services. Mother did not get along with her therapist there and asked for a new referral. DHS acquiesced and referred her to ACES Counseling Center. She quit that program when she received her medical marijuana card.

[8] When DHS learned that mother and M were not living together, her cash assistance was cancelled and her food stamps were reduced. The case was also referred to a fraud investigator. Mother admitted receiving benefits to which she was not entitled and, as a penalty, she was ordered to repay the amount that had been overpaid. She was also unable to receive benefits for one year. At the time of the termination hearing, the amount still owing was $3,405.81.

intern who led the support group, notified DHS of M's disclosure and Lucy Welch, an intake worker at DHS, arranged for M to be interviewed at the Child Advocacy Center. During the interview, M reported that one evening when she was staying in the trailer and sleeping in the bed between mother and Scott, Scott, who was not wearing any clothes, put his hands down her panties and fondled her genitalia while she pretended to be asleep. He also placed her hand on his genitalia and had her masturbate him. When M told mother what had happened, mother told her not to tell anyone. According to M, mother did not do anything about it, except put M on the other side of her in the bed after that. M told Cram that the abuse continued after she told mother about it.

After the interview, Welch instructed mother to terminate her relationship with Scott and that M was not to have any contact with him. Welch testified that mother

"[had] difficulty believing that [the abuse] had occurred. She said that to a point she did not want to believe it had occurred because herself and her older daughter [J] had both been victims of sex abuse. And that she had asked Mr. Scott about it and he denied it. So she wasn't sure if she believed it or not."

Mother also told the police officer who investigated the sex abuse that "[n]o way did that occur." She admitted that M had told her about the abuse about a month earlier, but stated that she had not reported it because she wanted time to investigate the allegation herself. She denied that she ever let M sleep between her and Scott in the bed and insisted that M always slept on the outside of the bed next to her.

A team decision meeting was held on February 25, 2004. DHS and mother agreed that M would be placed in shelter care with Duke while DHS began the process of certifying him as a foster care provider. At the meeting, mother denied knowing that Scott was a convicted sex offender, despite having told DHS otherwise in August 2000. DHS agreed to refer M for mental health counseling, and mother agreed to continue to attend weekly counseling sessions and to take her prescribed medication.[9] Father was not present at the team decision meeting.

---

[9] Mother was apparently engaged in weekly individual therapy sessions at Options Counseling Services at this time.

On February 27, 2004, DHS filed a dependency petition in juvenile court based on mother's mental and emotional condition, her failure to protect M from sexual abuse, and father's inability to provide for M due to his involvement in criminal activities and frequent incarceration.[10] After a shelter hearing, the court temporarily committed M to DHS's custody and ordered that any visits by the parents first be approved by the agency.

On March 9, 2004, father told a DHS representative that he wanted to be an eventual placement for M, although he was not available at that time because he had criminal charges pending and would be serving jail time. He approved of Duke caring for M but wanted her eventually to be with his own family. DHS approved father visiting M at Duke's house.

On March 21, father met with a DHS caseworker, admitted that he had past problems with drug and alcohol abuse, and volunteered to take a urinalysis. His urinalysis tested positive for methamphetamine and marijuana.

DHS filed an amended dependency jurisdiction petition on April 15, 2004. Mother admitted that the court had jurisdiction based on her failure to protect M from sexual abuse by allowing Scott, whom she knew to be a convicted untreated child sex offender, to have contact with M. Father also admitted jurisdiction based on his lack of a custody order to protect M from mother, his criminal history and pending criminal charges "that could interfere with his ability to parent [M]," and "his use of alcohol and/or controlled substances [that] interferes with his ability to parent[.]" The trial court found M to be within its jurisdiction and placed her in the legal custody of DHS.

Mother and father entered into a service agreement with DHS on May 4, 2004. Mother agreed to continue to look for housing, to participate in a psychological evaluation, and to follow the evaluator's recommendations. Father agreed to participate in a drug and alcohol assessment, scheduled for

---

[10] The record reflects that, at the time, father had charges pending for first-degree burglary, unauthorized use of a vehicle, first-degree theft, felon in possession of a firearm, and aggravated first-degree theft. He also had several prior convictions.

the following day, as well as a psychological evaluation, and to follow the evaluator's recommendations. DHS informed the parents of the time limits under federal law within which the parents were required to resolve DHS's safety concerns.

Psychologist Robert Basham evaluated mother in July 2004. At the time, she was homeless again and no longer attending individual therapy sessions or taking antidepressant medication because she had lost her health plan coverage after M was no longer in her care. She had not worked for three years, due to substantial shoulder pain. Basham noted in his report that

"[mother's] life situation was fairly desperate even prior to her daughter's removal, but she has deteriorated since, now having lost her mental health coverage on her insurance, and with continuing homelessness. She continues to hold out hope of getting on SSI, but if her appeal fails, it is not clear how [mother] will get by or be able to financially support [M]."

Basham diagnosed mother with recurrent major depressive disorder, post-traumatic stress disorder, cannabis dependence, and dependent personality disorder. He found that, although mother had the basic intellectual capacity to parent, the years of abuse during her marriage had had a profound psychological effect on her. He recommended antidepressant medications and individual therapy for depression and post-traumatic stress disorder. He also recommended residential drug treatment for her cannabis dependency and noted that she needed to seek alternatives to deal with her pain and appetite problems. Regarding her marijuana use, he stated:

"It may well have the beneficial effects she describes to it, but it is nonetheless a mood and mind altering substance with a high potential for abuse, one that [a]ffects the quality of thinking and the ability to use good judgment. The circumstances for removal of her daughter from her care several months ago show the presence of unambiguous poor judgment and her use of marijuana was likely a factor in her failure to anticipate an attempt by the individual to abuse her daughter."

Basham opined that mother's depression, post-traumatic stress disorder, and cannabis dependency were treatable problems and "benefits could be expected in a time frame of six months to a year" if she was willing to pursue treatment and quit using marijuana. However, he also found that she had longstanding personality problems, "which leave her at risk of failing to protect her daughter or continuing to depend upon those who pose a risk to her or her daughter" even if she is largely successful in treating her other psychological problems. He concluded:

> "[Mother] is not psychologically capable of providing needed care and protection of her daughter at this time, and still has much to do with regards to treatment and life stabilization before she will be ready to do so. If [mother] does not show significant progress with this, it may be more appropriate to consider her as a visiting resource only, and to look for a permanent alternative care provider."

Mother began family therapy in July 2004. Her therapist, Shelby Schneider, reported that mother attended sessions regularly until the provider's contract with DHS expired, approximately six months later. Her goals in therapy were to work toward achieving stability in income and housing and to acknowledge her role in failing to protect M from abuse. At the conclusion of therapy, Schneider reported that mother had made "limited progress." Mother also completed a parenting program during this time.

In August 2004, DHS referred mother for a drug and alcohol evaluation. In connection with that evaluation, Mother reported using marijuana regularly since the age of 12 and consuming "approximately an eighth of an ounce per week." She also reported that she had started two outpatient treatment programs, but had not completed either of them. She denied, however, that she was chemically dependent, stated that she would be "concerned if treatment was recommended," and reported that the only negative effect of her marijuana use was that M had been exposed to it. The evaluator did not recommend treatment because mother reported that her use of marijuana was consistent with what was allowed under her medical marijuana card.

Also, in August 2004, Scott was arrested for sexually abusing M. Scott later entered into a plea agreement and was convicted of third-degree sexual abuse. Mother was in the car with him when he was arrested. Mother told M's caseworker, Rae Karp-Curtis, that this was the only time she had seen Scott, meaning, apparently, since M was removed from her care. She also said that she did not feel any responsibility for exposing M to Scott because M had begged to spend the night with them. In short, mother felt that the abuse was M's fault, not hers.

Father, in turn, failed to attend his scheduled drug and alcohol evaluation and did not request that it be rescheduled. In June 2004, father told Karp-Curtis that he was willing to attend a residential drug treatment program. However, DHS determined that there was not enough time for him to complete the program before he had to begin serving his jail sentence.[11]

Father had several supervised visits with M before his incarceration, and the visits were generally good.[12] However, father did not always attend, leading M to call him "[t]he liar." In addition, at his visit on May 27, 2004, father's speech was slurred and, instead of engaging with M as he usually did, he lay on the floor. Thereafter, Karp-Curtis told him that he would have to pass a urinalysis test if he wanted to visit M. Father did not have any visits with M after July 2004.

A citizen review board reviewed M's case on August 26, 2004. DHS told the board that it did not consider Duke to be a permanent resource for M. Instead, the agency was seeking a relative placement, because Duke, who was 70 years old, did not supervise M very well and allowed her to have daily contact with mother. Duke told the board that M could live with him "forever" if necessary. Father, who appeared by telephone from jail, stated that he wanted to work toward

---

[11] Father was incarcerated from July through November 2004. By the time he was released from jail, DHS had changed the plan for M from reintegration to termination of parental rights. Therefore, the agency did not offer father drug treatment at that time.

[12] The record also shows that he telephoned M weekly while he was in jail, although those telephone visits were not approved by DHS.

having M placed in his care and expressed concern that the caseworker had not set up any service expectations for him. The board concluded that the issues that had brought M into state care had not been resolved. Nonetheless, it also noted that "[t]he goal remains return to parent."

In September 2004, DHS changed its plan for M from reintegration into mother's home to termination. On October 28, DHS moved M from Duke's home and placed her with her paternal grandmother. Karp-Curtis encouraged mother to remain engaged in services and mother agreed to do that. From October to December 2004, mother participated in an eight-session group therapy program for parents of children who have been sexually abused. Her therapist testified that, although mother acknowledged that M had been abused, she "didn't realize the extent of the abuse and the extent of the impact of the abuse." At the conclusion of the program, the therapist noted that mother had made some progress but needed to continue to address her denial about her role in M being in foster care. She also stated that mother "probably did get as far as I expected her to get * * * with the limits of the group being an eight-session group."

After his release from jail in November 2004, father telephoned DHS several times to inquire about M and to express his desire to work toward providing a home for her. During one telephone call, father asked if he could visit M and Karp-Curtis told him that he first needed to pass a urinalysis test to ensure that he was clean and sober for the visit. Father never took the urinalysis test and did not request visits after that. As noted, DHS did not offer father drug treatment after his release from jail because it had by then changed the plan for M from integration to termination of parental rights. However, Karp-Curtis testified that DHS could have provided drug treatment if father's attorney had requested it.

In January 2005, Truhn evaluated mother in connection with her application for state senior and disabled services benefits. He diagnosed mother with major depressive disorder, recurrent moderate; post-traumatic stress disorder, chronic; cannabis dependence; alcohol abuse; and dependent personality disorder with histrionic features.

Truhn's overall diagnosis was much the same as almost two years earlier. The only improvements he noted were that her major depressive disorder had become less severe and her post-traumatic stress disorder symptoms were "in kind of a stable, long-term basis rather than acute and chronic as they were in the previous examination." However, her drug use posed a greater concern, and he revised his earlier diagnosis of cannabis use to cannabis dependence. The revised diagnosis was based on several factors, including mother's increased drug tolerance,[13] her ongoing use of marijuana despite its negative consequences, and her previous unsuccessful attempts to stop using the drug, even with chemical dependency treatment. Truhn opined that mother's use of marijuana had negatively affected her choice of relationships.

As noted, Truhn also more specifically identified mother's personality disorder as dependent, with histrionic features. He described "histrionic features" as including a lack of insight into functioning, heightened emotions and, in some instances, the development of physical pain during periods of stress. He noted an increase in mother's physical symptoms and complaints since the previous evaluation and opined that psychological factors could be exacerbating her pain. Truhn explained that her condition is also characterized by a defensive response style and an attempt to present herself in a positive light. Consistent with that characterization of her condition, mother told Truhn that DHS had removed M from her home because she had exposed M to marijuana use, not because she had failed to protect M from being sexually abused by her boyfriend.

Truhn opined that mother's overall ability to accomplish the normal activities of daily living had significantly decreased since his last evaluation. Mother was still unemployed and reported being unable to work because of pain, numbness, and inability to sit or stand for too long in one position. She was living with Duke and relied on him to do most of the household tasks, such as cooking, cleaning, and laundry. Truhn recommended

---

[13] At the time of the evaluation, mother reported using marijuana daily.

"that [mother] continue to participate in medication evaluations * * *. It seems her psychological issues are chronic and have remained relatively stable over several years. Her ability to accomplish the activities of daily living seems to be significantly affected by motivation and at least by perceived physical problems. There is a possibility that her psychological functioning could be exacerbating somatic complaints or that there might be a strong psychological component to some of her somatic complaints.

"* * * * *

"* * * There is a strong chance that as her life stress increases, her ability to accomplish these tasks and other day to day activities may decrease, as she develop[s] more and more somatic complaints and the depression and anxiety become more severe."

Truhn recommended continued intensive individual psychotherapy and possible group therapy, further chemical dependency evaluation and treatment, monitoring of mother's antidepressant medication, continued participation in medical reviews, close supervision of her medical marijuana card, and the exploration of alternatives to it. He also recommended that she consider participation in a day treatment program or sheltered workshop. Truhn concluded that, "[mother's] prognosis is poor. The physical and psychological symptoms seem to be significantly affecting her performance and have not decreased with medication and psychotherapy."

The court held a permanency hearing on February 11, 2005, and concluded that it was in M's best interest to implement the alternate plan of adoption. The court relieved DHS of its responsibility to reunite M with her parents and ordered that the parents not have any contact with M except during supervised visits at the DHS office. In March, DHS moved M from her grandmother's home to a therapeutic foster home.[14]

Mother continued to have weekly supervised visits with M and, until a few weeks before the termination hearing, the visits went well. Mother regularly attended, was on time, and telephoned if she could not attend. She also

---

[14] That decision was apparently the result of the grandmother's resistance to M receiving counseling.

brought appropriate gifts and food, and the games and activities that she engaged in with M were generally appropriate. The caseworker was not concerned that mother was under the influence of alcohol or drugs during the visits. Additionally, nothing unsafe or threatening occurred.

A few weeks before the termination hearing, however, DHS discontinued mother's supervised visits because of comments mother made to M about the upcoming hearing. Mother indicated that she wanted M to testify and that she expected M to say she wanted to live with mother. Afterward, according to M's foster mother, Hatfield, M regressed dramatically. She cried a lot, and destroyed clothing, toys, hair ribbons, and other items. She wrote on the carpet and the bedspread. She indicated repeatedly that she was worried about testifying, and she consistently asked if she would still be able to live with Hatfield. After consulting with M's therapist, DHS decided to terminate mother's visits.

The termination hearing commenced in October 2005. In addition to adducing the evidence just recounted, the state introduced testimony from expert witnesses about M's special needs and her likely prognosis if those needs were not met.

Peter Schnabel, a psychiatric mental health nurse practitioner, evaluated M in April 2005 and diagnosed her with chronic post-traumatic stress disorder; major depressive disorder, single episode, moderate; learning disorder (not otherwise specified) by history; sexual abuse; and attention deficit-hyperactivity disorder (provisional). He also included a "rule out" diagnosis of reactive attachment disorder, inhibited type. In a June 2005 follow-up report, he noted that "it has become very clear that [M] exhibits a complex array of symptoms across domains of cognition, affect, [and] anxiety. [M's] functional level within the home [and] school settings is severely compromised by her psychiatric [disorder] and will require a high level of support in both settings." At the hearing, he testified that, given her vulnerability, M needed a calm and predictable home environment. In his opinion, her mental health was fragile and her sense of uncertainty about whether "she really is going to have people that will be consistently caring in her environment" would

increase in a chaotic environment and cause more symptoms of anxiety and emotional distress. Schnabel testified:

> "I think it's * * * a tremendous amount at stake that she stays in an environment that has nurturance and consistency for her. That's her basic needs.
>
> "* * * * *
>
> "* * * So I think she really is highly at risk if she is not in an environment where she has consistent, nurturant, trustworthy people around her."

Schnabel indicated that M's fragility will persist over time. In his opinion, even with medication, she will need ongoing support and care and, possibly, another course of more intense therapy.

Catherine Meeks, an art therapist who specializes in helping children who have been severely abused, also testified that M was "very fragile." Meeks indicated that M believed it was her fault that she was not living with her mother. Meeks explained that stability and security were "absolutely" important for M to overcome her emotional problems and that she will need a great deal of help with her schoolwork. She testified that M would benefit from a "more therapeutic milieu" for schooling, instead of the traditional public school setting. According to Meeks, M will require therapy for a considerable period of time and, possibly, a higher degree of treatment as she reaches developmental milestones, including adolescence.

Peter Powers, a psychologist who evaluated M in May 2005, diagnosed her as suffering from post-traumatic stress disorder; attention deficit-hyperactivity disorder, predominately inattentive type; sexual abuse; neglect; reading disorder and disorder of written expression. His evaluation was based on four sources: background information, test instruments, interview data, and observations. He presumed that M's post-traumatic stress disorder was primarily caused by the sexual abuse inflicted by Scott, and, possibly, her exposure to drug and alcohol abuse. Powers explained that M's

> "under-socialization and exposure to traumatic experiences has led her to develop a fantasy world and undermined her emotional self-control. * * * Her depressed mood would also

appear closely related to trauma and could be expected to improve along with other symptoms of that disorder when appropriately treated.

"[M] struggles with social skills and attentional deficits which have made her adjustment to her current foster home and school environment even more difficult. She is reportedly receiving some assistance for her learning disabilities * * * but clearly requires more intensive interventions to overcome the combination of those disabilities and her disabling psychiatric conditions."

He thus recommended that M be enrolled in a long-term day treatment program "to begin to address her significant and pervasive needs." He also recommended continuing psychiatric care and play therapy. Although M indicated during testing that one of her wishes was "to live with mom," Powers noted that M appeared to have adapted well to her current foster placement. He stressed that "[m]aintaining a stable, home-like setting should be a high priority as [M] would seem to learn best through the modeling of appropriate behavior by other children passing through a normal developmental sequence." In Powers's opinion, "structure is probably one of the most important ways to help her recover."

Powers indicated that M was an unusually troubled child. He stressed that it is important for her to have a caregiver with good emotional control. In his opinion, M will probably need continuing treatment and her caregiver must be able to support that treatment very clearly both in terms of getting her there and in not undermining it in any way. He described her future in this way:

"[T]he problem is if she's unable to form positive relations with others that aren't manipulative or sexualized, she's obviously at risk for revictimization, sexual revictimization. She's definitely at risk for being involved with people who might use her or take advantage of her in other ways too."

The state also presented evidence about M's experience in foster care. Her foster mother, Hatfield, testified that, initially, M spent an unusual amount of time in a fantasy world; she believed herself to be a cat 50 percent or more of the time. She would make tails and attach them to the back

of her pants, crawl on all fours, meow, and hiss. She also believed that she was the foster parent of an orphaned unicorn and made up a unicorn language consisting of 50 to 75 words. M exhibited intense daily episodes of sadness and frustration. M's physical condition was also "[v]ery poor"; she was "very, very thin," and had a severe staph infection of the nostrils and chronic head lice. In addition, chunks of her hair were missing and she had open sores.

Many of those symptoms had dissipated, but Hatfield testified that, even at the time of the hearing, M was unable to take care of herself and would not touch her own body. Hatfield had to shower her, wash her hair, dry her, and assist her with dressing. She could not brush her teeth independently, although she was making progress in that area. Hatfield said that M was very happy in her home. Although she struggled in school and was academically delayed, she loved school. M had a number of friends in the neighborhood who liked to play with her, although she tended to play with children several years younger than she.

Karp-Curtis testified that, after M was moved to her foster home, she began sharing some of the things that had happened to her and exhibited extreme mental health behaviors. She testified that M

"always said that she doesn't want to live with her mother because she wants to be somewhere * * * where she can be in a clean house and where people don't hurt her.

"* * * * *

"* * * She wants to live in the home where she's living now forever."

According to Karp-Curtis, "the plan is that [her current foster home is] a permanent resource for [M]."

Basham also testified at the hearing and expanded on his written evaluations of mother. He opined that mother's multiple psychological diagnoses impaired her ability to be an adequate parent for M. He explained:

"All of her psychological conditions play a role in that inability to protect. Her dependent personality disorder is perhaps the strongest of those. It is a condition that is long

lasting and has likely been in effect since her childhood. And it leaves her prone to depend upon others both in an emotional sense and also in a practical sense. And as part of that, to have a lack of confidence in her own judgment, problems with assertiveness and a readiness to either give in or defer to the wants and judgments of others."

He stated that mother's personality disorder is resistant to treatment and slow to change. He stressed that her frequent use of marijuana impaired her judgment and that her continued drug use would prevent her from addressing her other deficiencies and substantially increase the risk that she would use poor judgment in the future.

Mother's case consisted primarily of her own testimony and Duke's.[15] Mother testified that she had done everything DHS required of her and had worked very hard to change. She described the parenting classes she had taken and her weekly counseling and therapy sessions. She recounted taking antidepressant medication regularly and felt that her depression was under control. When asked what she had done to provide a home for M, she replied that she had "learned how to be a better parent[,]" she had "learned how to read signs on people better[,]" and she had "learned what kind of people to be around and * * * what kind I don't want to be around anymore."

Mother stated that she had been living with Duke since November 2004 and was relying on him for financial support. She had no income and was not receiving any public assistance, other than $120 per month in food stamps and health care coverage.[16] She testified that she had applied for social security disability benefits five years earlier, had been denied three times, and was waiting for a hearing. Mother's plan to create a home for M was to use the "five years back pay" that she expected to receive from social security to put a down payment on a home. Mother testified that she and M could live with Duke until she received her social security benefits. She testified that she had not sought employment

---

[15] Nelson and another friend of mother also testified, relating that mother took good care of M when she was in her care.

[16] Mother's $314 per month grant from the state's senior and disabled services was discontinued earlier that month because the program had terminated.

because of her physical limitations. When asked what she would do if she did not receive disability payments, she said, "I guess I'm going to have to go back to work and hurt myself worse. I'm not sure." She testified that she might try to find a job that was within her physical restrictions, such as working with computers or a home business.

Mother disagreed with the opinions of the psychologists and caseworkers that marijuana use had impaired her judgment. She also disagreed with the recommendation that she seek alternative pain treatment. She testified that she had tried many different pain medications in the past and was unable to tolerate them. She stated that marijuana allowed her to "still function and be able to do things without feeling out of it."

Mother testified that it was difficult for her to accept that Scott had sexually abused M but that she now believed it had occurred. However, she also admitted that she had contacted Scott in June 2005 for help in dealing with her medical marijuana provider. When asked how she planned to deal with M's serious emotional problems, mother replied that she would "take her to counseling. Keep her in therapy. Make sure she gets everything she needs."

Duke testified that he and mother had been in a platonic relationship for 13 years and that mother had lived with him for the previous year. He opined that mother and M had a good relationship and that M was generally well cared for when she was with mother. According to Duke, M was a normal eight-year-old girl when she lived with him. She could bathe, dress, and feed herself, but needed help tying her shoes. In Duke's opinion, mother's problems predominately stemmed from being sick and having trouble with her older daughter, J.

Father's case consisted of testimony from two of his brothers. Both testified that father and M had a loving relationship and that father had repeatedly expressed concern about M, especially in the months before the hearing. They testified that father visited M, bought her clothes when she needed them, and often gave her toys. Although acknowledging that father had used methamphetamine in the past, one brother, Timothy, testified that father was not dependent on

methamphetamine and that he used it solely for recreational purposes. He also testified that he had not observed behavior indicating that father had used methamphetamine for more than one and one-half years.

After the hearing, the trial court entered a judgment terminating mother's parental rights on the grounds of unfitness, ORS 419B.504,[17] and neglect, ORS 419B.506.[18] It entered a separate judgment terminating father's parental rights on the same grounds. Mother and father appeal, and we consider each appeal in turn.

## II. MOTHER'S APPEAL

Mother raises two assignments of error. Her second assignment of error challenges the trial court's neglect determination. The state concedes that it failed to establish that ground for termination under ORS 419B.506 and, on *de novo* review, we agree. *See State ex rel Dept. of Human Services v. Squiers*, 203 Or App 774, 789, 126 P3d 758 (2006).

■          Accordingly, we turn to mother's remaining assignment of error. In that assignment, mother asserts that the state failed to prove by clear and convincing evidence that her parental rights should be terminated on the ground of unfitness.[19] In *State ex rel SOSCF v. Stillman*, 333 Or 135, 145-46,

---

[17] ORS 419B.504 provides, in part:

"The rights of the parent or parents may be terminated * * * if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child or ward and integration of the child or ward into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change."

[18] ORS 419B.506 provides, in part:

"The rights of the parent or parents may be terminated * * * if the court finds that the parent or parents have failed or neglected without reasonable and lawful cause to provide for the basic physical and psychological needs of the child or ward for six months prior to the filing of a petition."

[19] The trial court found that mother was unfit based on the following conduct or conditions: (1) addictive or habitual use of intoxicating liquors or controlled substances to the extent that parental ability has been substantially impaired; (2) lack of effort or failure to obtain and maintain a suitable or stable living situation for the child so that return of the child to the parent is possible; (3) failure to present a viable plan for the return of the child to the parent's care and custody; (4) failure to learn or assume parenting and housekeeping skills sufficient to provide for the safe and proper raising of the child; (5) an emotional illness, mental illness, or mental deficiency of such nature and duration as to render the parent incapable of providing care for extended periods of time; (6) failure to protect the child from physical

36 P3d 490 (2001), the Supreme Court described the inquiry for determining whether a parent is unfit under ORS 419B.504 as follows:

> "ORS 419B.504 sets out a two-part test for determining whether to terminate parental rights, both parts of which must be met before the court orders termination. First, the court must address a parent's fitness: The court must find that the parent is unfit by reason of conduct or condition seriously detrimental to the child. That, in turn, requires a two-part inquiry: The court must find that: (1) the parent has engaged in some conduct or is characterized by some condition; and (2) the conduct or condition is seriously detrimental to the child. Second—and only if the parent has met the foregoing criteria—the court must also find that the integration of the child into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change. That second part of the test for termination requires the court to evaluate the relative probability that, given particular parental conduct or conditions, the child will become integrated into the parental home within a reasonable time."

(Internal quotation marks omitted.) ORS 419B.521(1) provides, in part, that "[t]he facts on the basis of which the rights of the parents are terminated, unless admitted, must be established by clear and convincing evidence * * *." Clear and convincing evidence refers to evidence that makes an asserted fact highly probable. *State ex rel Juv. Dept. v. Johnson*, 165 Or App 147, 156, 997 P2d 231 (2000).

In arguing that the state did not meet its statutory burden, mother relies on evidence that, although "her conduct in allowing M to have contact with Scott was seriously detrimental," she had since participated in counseling and a support group of "nonoffending" parents, had no ongoing relationship with Scott, and intended to make a home for herself and M with Duke. She also relies on evidence that,

---

and sexual abuse; and (7) failure to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected.

although she had limited financial resources and had occasionally been homeless, at the time of the hearing she was living with Duke in a home that DHS had found to be appropriate for M. Finally, mother argues that, because DHS removed M from her custody because of sexual abuse allegations, not because of concern about her marijuana use, mother's dependence on marijuana could not be a factor in the unfitness determination.

After reviewing all of the evidence in this case, we conclude, for the reasons that follow, that the state proved, by clear and convincing evidence, that mother is unfit based on conduct and conditions that, in combination, are seriously detrimental to M. *See State ex rel Dept. of Human Services v. Rodgers*, 204 Or App 198, 218, 129 P3d 243 (2006) ("Child is exposed to all of the proven conduct and conditions together, and our unfitness determination is similarly based on consideration of that combination of conduct and conditions and on whether that combination is seriously detrimental to child." (Internal quotation marks omitted.)).

■ As the Supreme Court instructed in *Stillman*, 333 Or at 146, we must "first identify the parent's conduct or condition, and then measure the degree to which that conduct or condition has had a seriously detrimental effect on the child." In addition, it is not sufficient that the conduct or condition was harmful to the child in the past; rather, the state must prove, by clear and convincing evidence, that it is seriously detrimental at the time of the hearing. *State ex rel Dept. of Human Services v. Smith*, 338 Or 58, 83, 106 P3d 627 (2005).

In *Smith*, the court concluded that the state had failed to establish the necessary nexus between the mother's alleged conduct and conditions and a serious, present detriment to her child. For example, the court found that the mother's decision to rent an apartment in a "low income" neighborhood and close to the grandparent's home where sex offenders had previously visited, was not, without more, seriously detrimental to the child. *Id*. at 82-83. The court also rejected the state's allegation that the mother was unfit by reason of a "mental deficiency." Although the mother did not have a diagnosed mental illness, the state contended that her low-average IQ, dependence on her family, tendency to lie

and tell outrageous stories, and failure to agree that the state acted properly in removing the child from her care evidenced a mental deficiency that rendered her unfit. Again, the court found that the state failed to show how this deficiency resulted in a serious detriment to the child and, therefore, termination on that basis was also unfounded. *Id.* at 85-86.

With the foregoing authority in mind, we consider the circumstances of the case before us, beginning with the condition of mother's alleged failure to provide a suitable living situation for M. The state presented evidence that mother has drifted from one temporary living situation to another throughout most of M's life, despite repeated assistance from DHS and other programs. The state also presented compelling evidence that mother's housing instability has been seriously detrimental to M's physical and mental health.

■ However, as the Supreme Court emphasized in *Smith*, to justify termination under ORS 419B.504, the pertinent condition must render the parent unfit at the time of the termination hearing. 338 Or at 83. At that time, mother had been living in Duke's home for almost a year, and DHS previously had determined that Duke's home was an appropriate placement for M. Moreover, mother testified that she and M could stay with Duke until she began receiving social security disability benefits. Although mother's ability to provide a home for M depended on Duke's assistance, ORS 419B.504 does not require that a parent be able to care for the child "independently," as long as the parent's inability to do so does not work to the detriment of the child. *Smith*, 338 Or at 86. There is no evidence to indicate that mother's reliance on Duke was detrimental to M.

Even so, however, mother's other conduct and conditions render her presently unfit to parent M. First, mother's serious mental illnesses contributed to her lack of judgment and failure to anticipate that Scott might abuse M. Two different psychologists credibly diagnosed mother with several mental illnesses, including a significant personality disorder, major depressive disorder, and post-traumatic stress disorder. According to Basham's undisputed testimony, all of mother's psychological conditions play a role in

her inability to protect M, with her personality disorder "perhaps the strongest of those." The disorder affects the quality of her thinking and leaves her prone to depend excessively on others and to give in or defer to the wants and judgments of others. Basham noted that mother's dependent personality traits are likely exacerbated by her drug dependency, posttraumatic stress disorder, and depression. Similarly, Truhn testified that individuals with mother's personality profile tend to be conforming and have little awareness of the consequences of their behavior on other people. He described mother's prognosis as "poor." He observed that her "physical and psychological symptoms seem to be significantly affecting her performance and have not decreased with medication and psychotherapy." Mother presented no evidence to rebut the existence of those serious psychological problems or to show that they had improved over time.

Next, mother's mental illness is exacerbated by her marijuana use. Both Truhn and Basham diagnosed mother as being dependent on marijuana. Basham stated that, regardless of its legality, mother's habitual use of marijuana impaired her functioning, in particular, her judgment. He stated that her marijuana use was likely a factor in her failure to anticipate that Scott would attempt to abuse M. Truhn, who evaluated mother on two separate occasions, also diagnosed mother with cannabis dependence. He indicated that her frequent use of marijuana negatively affected her choice of relationships and led her to remain in unhealthy relationships. Again, beyond her own testimony that she was not dependent on marijuana and that it did not negatively affect her judgment, mother did not present any evidence to contradict those experts.

We are persuaded that mother's conditions have not abated to the extent that they are no longer seriously detrimental to M. First, although mother asserts that she had terminated her relationship with Scott, her conduct casts doubt on that assertion. She was present with Scott when he was arrested for abusing M, six months *after* DHS removed M from her care. And, as late as June 2005, while mother was trying to regain custody of M, she contacted Scott for help in dealing with her medical marijuana provider. Not only does that evidence suggest that mother still had a relationship

with Scott, it also indicates that marijuana has priority in mother's life such that she is likely to put her need for it before M's needs.

Even if mother ceases all contact with Scott, her dependent personality disorder and drug dependency make it likely that she will again involve herself in harmful relationships or otherwise place herself in situations that pose substantial risk to M. Both Basham and Truhn indicated that her personality disorder makes her prone to become involved with abusive or exploitive partners. Her marijuana use further clouds her judgment and leads her to make bad decisions that are likely to place M in harm's way.

In addition, as in *State ex rel Dept. of Human Services v. Simmons,* 203 Or App 279, 311, 125 P3d 66 (2005), *rev allowed,* 340 Or 411 (2006), mother is unable to appreciate the extent to which her conduct has harmed M. In *Simmons,* the mother had a diagnosed personality disorder and was addicted to the prescription drug OxyContin. Although she had made some progress in addressing her drug addiction, we concluded that her long history of drug abuse, when coupled with her personality disorder, rendered her incapable of recognizing the effects of her drug addiction on her child. *Id.* at 312. Similar circumstances exist here. Mother has participated in domestic violence counseling, individual therapy, and group therapy for parents of abused children. Even so, she continues to vacillate between accepting responsibility for M's abuse and blaming M. Her group therapist testified that, even after completing the program, mother did not appreciate the extent to which the abuse had affected M. Mother's lack of insight increases the risk that she will expose M to harm in the future.

The circumstances that we confronted in *Squiers*, on the other hand, are not analogous. There, we held that the mother's "borderline personality traits," although potentially making her more vulnerable to abusive partners, were not seriously detrimental to her children. 203 Or App at 793. In that case, DHS had removed the children from the mother's home, in part, because she let them have contact with the father, who had been convicted of assaulting other children. However, the psychologist who evaluated the mother

described her mental health condition as "less serious" and "more likely to respond to treatment or life circumstances than a genuine personality disorder." *Id.* at 785 (internal quotation marks omitted). He further noted that the mother did "not show signs of mental illness or serious personality problems which would leave her wholly unable to function as a parent." *Id.* at 780 (internal quotation marks omitted). In addition, the mother did not have any drug or alcohol issues that negatively affected the children, and there was no evidence that the children had ever been harmed or traumatized while in the mother's care. *Id.* at 795. We also noted that the mother's actions—including ceasing all contact with the father for more than two years—showed her resolve to keep the father away from the children in the future. Finally, the mother did not have a pattern of abusive relationships. *Id.* at 792-93.

In this case, by contrast, mother has a serious personality disorder that is resistant to treatment. She also has an unresolved drug dependency that exacerbates her mental health condition and makes it less likely that treatment will be successful. As a result of those conditions and mother's related conduct, M was seriously harmed. For example, mother allowed children to use marijuana in her home. M, who was in the bedroom and thus at least observing, if not participating, was five years old at the time. Much more significantly, it is undisputed that mother permitted Scott, whom she knew to be a convicted child sex offender, to have contact with M. Demonstrating indisputably poor judgment, she also allowed Scott to sleep, naked, in the same bed with M. Then, even after M confided in mother about the sexual abuse that occurred, she continued to let M sleep in the same bed with Scott. She also instructed M not to tell anyone about the abuse. M was significantly traumatized as a result. Her mental health is very fragile and she is unusually vulnerable to predatory behavior. It is likely that she will continue to need therapy and a high level of support to overcome her problems.

■ In sum, we conclude that the state has proved, by clear and convincing evidence, that mother is unfit by reason of mental illnesses and drug dependency that are seriously detrimental to M. We therefore proceed to the second part of

the test under ORS 419B.504—that is, whether "integration of the child or ward into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change." A reasonable period for integration must take account of the child's "emotional and developmental needs and ability to form and maintain lasting attachments." ORS 419A.004(20). *See Stillman*, 333 Or at 146. "That inquiry is child-specific. It calls for testimony in psychological and developmental terms regarding the particular child's requirements." *Id.*

The record reflects that mother has made some positive changes in her life. At the time of the hearing, she no longer lived with Scott and apparently had had minimal recent contact with him. She had been living in a stable home environment for the past year. She also had complied with some of the recommendations resulting from her psychological evaluation, and she had participated in services offered by DHS. She had been involved in ongoing therapy, had completed a group therapy program for the nonoffending parents of children who have been sexually abused, and had completed a parenting program.

However, even with this level of services, mother's progress has been very limited. There is no credible evidence that mother's mental health issues have resolved, or will be resolved, within a reasonable time, to the point that she can provide proper care for M. According to Truhn, "her psychological issues are chronic and have remained relatively stable over several years." In the nearly two years that transpired between his two evaluations of her, Truhn found that mother's physical and psychological symptoms "[had] not decreased with medication and psychotherapy" and noted that her ability to accomplish the normal activities of daily living had significantly decreased. In addition, both her individual therapist and the counselor who supervised the nonoffending parent group opined that, although mother had made some progress toward recognizing her responsibility for what happened to M and toward learning to dissociate herself from dangerous people, she needed to continue to work on that goal.

Finally, mother's personality disorder is largely resistant to treatment and likely to persist over a period of years. And, because mother is not willing to stop using marijuana and engage in drug treatment as recommended by the psychologists who evaluated her, she is even less likely to make progress through treatment. Basham's opinion was unequivocal and persuasive: mother's continued use of marijuana will effectively prevent her from addressing her other mental health problems. In other words, unless she addresses her marijuana dependency, there is little hope for treating her personality disorder and other mental health conditions, and they are unlikely to change.

This case is distinguishable from *State ex rel Dept. of Human Services v. Huston*, 203 Or App 640, 126 P3d 710 (2006). In that case, like this one, the mother suffered from chemical dependency and long-term mental health conditions, including post-traumatic stress disorder, anxiety disorder, and a personality disorder. However, at the time of the termination hearing in that case, the mother had been sober for nearly a year. In addition, although the psychologists who initially evaluated the mother supported termination, the two treatment providers who worked with her *after* those evaluations testified that she had made considerable progress in counseling, was highly motivated, and possessed adequate parenting skills. In short, the evidence there indicated that the mother had been able to achieve significant changes in her life, including achieving sobriety, *despite her personality disorder. Id.* at 654. In the case before us, by contrast, the experts uniformly agreed that, despite years of treatment, mother's mental health conditions had not significantly improved and that they were unlikely to do so especially in view of her unwillingness to address her marijuana dependency.

We also must consider mother's conditions in light of M's particular circumstances. *Id.* at 657. In *Huston*, we found it significant to our analysis that the child in that case had no special needs that would present any challenges for mother "beyond those ordinarily inherent in parenting." *Id.* That is not the case here. M has been diagnosed with chronic post-traumatic stress disorder and with major depressive disorder. Powers found her to be an unusually troubled child. She

dissociates at times and has developed a complex fantasy world as a coping mechanism. She also has a learning disorder and is significantly delayed academically. M unquestionably needs a high level of adult engagement and support for the foreseeable future.

Both experts who evaluated M, as well the therapists who treated her, unequivocally stressed her need for structure and consistency. Powers noted that she is unusually vulnerable to predatory behavior and, thus, is at risk of being abused or mistreated if she is not adequately protected. She also needs appropriate modeling from other children as well as adults to help her catch up to her peers developmentally. Schnabel testified that she was "really [ ] highly at risk if she is not in an environment where she has consistent, nurturant, trustworthy people around her."

The question of the children's special needs was also at issue in *Squiers*. 203 Or App at 794. However, in that case, the mother was able to persuasively articulate how she would address her children's learning delays and other special needs. *Id.* For example, she demonstrated an awareness of their need for repetition to assist in the learning process. She testified that she would help them learn to communicate better by offering them choices and then teaching them about the consequences of those choices. She was learning to read their mannerisms and facial expressions so that she would be alerted to possible problems before they escalated.

The record in this case, on the other hand, does not demonstrate that mother has a sufficient level of understanding and appreciation of M's special needs, which involve serious psychiatric conditions as well as a learning disorder. By telling M that she might have to testify at the termination hearing and pressuring her about what she should say, mother demonstrated a serious failure to appreciate M's fragile emotional state, a failure that resulted in significant distress to M. She also was unable, at the termination hearing, to articulate an understanding of M's specific needs, beyond agreeing to take her to therapy. That lack of insight is consistent with Basham's observation that "[a]s long as she continues with these [psychological] problems and continues with

her use of marijuana, I don't believe that [she will] have adequate appreciation and sensitivity to her daughter's problems to be able to address [her] complex special needs."

In addition, mother has not presented a viable plan for M's return to her care.[20] At the time of the termination hearing, she denied that her marijuana use was problematic and expressed no plan for discontinuing its use and entering drug treatment. Consequently, it is unlikely that she will make progress, even if she continues in therapy, in treating her other mental health conditions. She also has not identified a realistic plan for supporting M in the event that she does not qualify for social security benefits. In short, mother has not demonstrated an ability to provide M with an environment in which her needs will be recognized, and it is doubtful that she can do so within a reasonable time.

■     In view of our determination that mother is unfit by reason of conduct or conditions seriously detrimental to M and integration into her home is improbable within a reasonable time, we must, finally, consider whether termination of mother's parental rights is in M's best interest. ORS 419B.500. As the Supreme Court emphasized in *State ex rel Juv. Dept. v. Geist*, 310 Or 176, 189, 796 P2d 1193 (1990):

> "Children have a right to grow up in a wholesome and healthful environment, free from fear of abuse, injury or neglect. Where a person is unable or unwilling to rehabilitate himself or herself within a reasonable time so as to provide such an environment, the best interests of the child(ren) generally will require termination of parent's parental rights."

We conclude that such is the case here.

M needs a stable home environment that provides her with a sense of security and predictability. She has suffered serious and long-term trauma as a result of mother's prior conduct and conditions. Although mother loves M, and M has expressed regret at times over the fact that they no

---

[20] The trial court found that this was a separate "condition" rendering mother unfit; however, it is more properly considered in our analysis of whether M can be integrated into mother's home within a reasonable time. *State ex rel Dept. of Human Services v. Rardin*, 340 Or 436, 445, 134 P3d 940 (2006).

longer live together, M has told her foster mother repeatedly that she doesn't want to live with mother because she wants to be "where she can be in a clean house and people don't hurt her." When faced with the possibility of having to testify that she wanted to live with mother, she reacted very negatively. She has adjusted well to her foster home and expresses extreme anxiety about the possibility of having to leave. Her caseworker indicated that the plan is for the foster home to be "a permanent resource" for her. The record leaves no doubt that M's emotional and psychological needs require the stability, consistency, and nurturing that her current placement provides her. Those are needs that mother cannot meet in the reasonable future. As we said in *State ex rel SOSCF v. Lehtonen*, 172 Or App 584, 594, 20 P3d 210, *rev den*, 333 Or 73 (2001), "[t]he opportunities for a parent to adjust conduct and conditions so as to be a minimally adequate parent simply cannot be unlimited. At some point, the child's needs for permanence and stability in life must prevail." That point has been reached and passed in this case. We are persuaded that termination of mother's parental rights is in M's best interests.

### III. FATHER'S APPEAL

■ With respect to termination of father's parental rights, the trial court made the following findings:

"2. [Father] is unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into the father's home is improbable within a reasonable time due to conduct or conditions not likely to change, including the following:

"a) Addictive or habitual use of intoxicating liquors or controlled substances to the extent that parental ability has been substantially impaired.

"b) Lack of effort or failure to obtain and maintain a suitable or stable living situation for the child so that return of the child to the parent is possible.

"c) Failure to present a viable plan for the return of the child to the parent's care and custody.

"d) Lack of effort to adjust the parent's circumstances, conduct or conditions to make return of the child to the parent possible or failure to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected.

"3. [Father] has failed and neglected without reasonable and lawful cause to provide for the basic physical and psychological needs of the child for six months prior to the filing of the petition as shown by his:

"a) Failure to maintain regular visitation or other contact with the child which was designed and implemented in a plan to reunite the child with the parent.

"b) Failure to implement a plan designed to lead to the integration of the child into the father's home.

"4. It is in the child's best interests that the father's parental rights be terminated and that the child be freed for adoption."

On appeal, father raises only the following assignment of error:

"The Court erred in finding that father was not presently fit as a parent, finding that he would not be able to resume his parental role within the reasonable future, and in finding that it was in the best interest of [M] for the father's rights to be terminated."

As discussed more fully below, we understand this to be a challenge to the trial court's termination of his parental rights on the grounds that he was unfit under ORS 419B.504. However, the trial court terminated father's parental rights based on unfitness, ORS 419B.504, *and* neglect, ORS 419B.506, both of which, if proven, are independently sufficient statutory grounds for termination. *State ex rel Dept. of Human Services v. Parmentier*, 203 Or App 677, 127 P3d 652, *rev den*, 340 Or 359 (2006); *State ex rel SOSCF v. Duncan*, 164 Or App 610, 614, 993 P2d 818 (1999), *rev den*, 330 Or 361 (2000). Because father challenges only the court's "unfitness" determination and does not dispute the court's independent determination of "neglect," we must affirm.

Although it lacked citation to any particular statutory provision, father's assignment of error expressly referred to the trial court's finding that father was not "fit," and it addressed the substance of the statutory criteria for terminating a parent's rights for unfitness under ORS 419B.504— that is, (1) whether the parent is presently unfit and (2) whether integration of the child into the parent's home is improbable within a reasonable time due to conduct or conditions not likely to change.

Father contended at oral argument that, although he did not identify it as a separate assignment of error, he did, in fact, challenge the court's finding of neglect in the body of his brief. We disagree with father that his brief can be read to include such a challenge. As set forth above, ORS 419B.506 provides, in part, that a parent's rights may be terminated on the basis of neglect "if the court finds that the parent or parents have failed or neglected without reasonable and lawful cause to provide for the basic physical and psychological needs of the child or ward for six months prior to the filing of a petition." The trial court made that determination and terminated father's parental rights on that ground, in addition to the ground of "unfitness." However, on appeal, father has focused his arguments solely on the ground of unfitness. The concluding paragraph of his brief is illustrative:

> "[Father] contends, however, that the state's Petition for Termination fails because the father is not currently *unfit*. If he is in need of services before resuming care, the agency should provide those services and allow the father to resume his relationship with [M], rather than having [M] continue with the new relationship, which very well may not succeed. Under these circumstances, the father is *fit*, and the possibility of reintegration within a reasonable time period are both substantial barriers to termination. This judgment should be reversed."

(Emphasis added.)

Father also argued in his brief that this court should apply the analysis of *State ex rel DHS v. Lee*, 194 Or App 633, 96 P3d 823 (2004), in deciding this case. *Lee* sets forth the test for terminating a parent's rights for unfitness under ORS 419B.504 and ORS 419B.500. Father did not cite the neglect

statute, ORS 419B.506, nor did the word "neglect" appear anywhere in father's brief. Likewise, the other cases on which he relied, *State ex rel Juv. Dept. v. Habas*, 299 Or 177, 700 P2d 225 (1985), *Huston*, and *Rodgers*, discuss the requirements for termination based on unfitness, not neglect. Father argued briefly that he made efforts to maintain contact with M, one of the criteria to be considered under ORS 419B.506, but he made that point in the context of how his drug use—an alleged "seriously detrimental condition" rendering him unfit—affected that contact.

In the statement of his assignment of error, father did challenge the trial court's finding that "it was in the best interest of [M] for the father's rights to be terminated." That finding was necessary to support the termination of father's parental rights on any ground, including neglect. ORS 419B.500. However, father did not develop that argument in his brief. The only other reference to the issue appeared in the summary of his argument: "It is easier and more likely in [M's] best interest to attempt to resurrect [father's] relationship rather than the current direction." Father did not mention the term "best interest," nor did he discuss the underlying concept elsewhere in the body of his brief. Nor, because father failed to challenge the trial court's neglect determination under ORS 419B.506, did he make any effort to address the best interest requirement in that context.

In sum, we find no basis for concluding that father challenged the trial court's termination of his parental rights based on the independent ground of neglect under ORS 419B.506. As we said in *Parmentier*, "as a practical and legal matter, it makes no sense to advance substantial arguments challenging one basis for termination where any consideration of those arguments will necessarily be precluded by the failure to assign error to the alternative ground for termination." 203 Or App at 682.

Affirmed.